**Dorothy Ruth PIRONE, Julia Ruth Stevens, Babe Ruth League, Incorporated and Curtis Management Group, Incorporated, Plaintiffs–Appellants,**

v.

**MACMILLAN, INCORPORATED, Defendant–Appellee.**

No. 461, Docket 89–7750.

United States Court of Appeals, Second Circuit.

Argued Dec. 7, 1989.

Decided Jan. 29, 1990.

---

W. Mack Webner, Washington, D.C. (Baker & Hostetler, Wash., D.C.; Bryan, Levitin, Franzino & Rosenberg, New York City, of counsel), for plaintiffs-appellants.

Richard M. Constantine, New York City (Jerry S. Birenz, Sabin, Bermant & Gould, Jan F. Constantine, New York City, of counsel), for defendant-appellee.

(R. Bruce Rich, Gregory S. Shatan, Weil, Gotshal & Manges, New York City, submitted a brief for amicus curiae Association of American Publishers, Inc.)

Before KAUFMAN, NEWMAN and WINTER, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

For almost a century and a half, baseball has been central to our common American heritage. The "National Pastime" has become a part of the national character and, to an extent, it belongs to all of us. Baseball's great players are public icons. But, to varying degrees, their names and pictures are also valuable commodities owned by persons anxious to prevent any unauthorized use of their property. This case forces us to assay the extent to which the name and likeness of George Herman "Babe" Ruth is such a protectible commodity.

Babe Ruth hardly needs an introduction. He was one of the greatest baseball players of all time. A stand-out pitcher in his

early years, his renown derives principally from his prowess as a hitter. His place in the pantheon of baseball legends is assured and his name is among those "that have sparked the diamond and its environs and that have provided tinder for recaptured thrills, for reminiscence and comparisons, and for conversation and anticipation in-season and off-season." *Flood v. Kuhn,* 407 U.S. 258, 262, 92 S.Ct. 2099, 2102, 32 L.Ed.2d 728 (1972).

While he lived, Ruth was paid by manu-facturers for the use of his picture or name in promoting the sale of various products. After Ruth's death, his daughters, appel-lants Dorothy Ruth Pirone and Julia Ruth Stevens, registered the words "Babe Ruth" as a trademark for "paper articles, namely, playing cards, writing paper and en-velopes." Appellant Babe Ruth League, Inc., an amateur baseball league, was li-censed to use the trademark to promote the league and to sell products bearing the Babe Ruth name, which it has done since 1955. Appellant Curtis Management Group, Inc., was authorized to license the mark to third parties in exchange for royal-ties.

In 1987, the appellee published *The 1988 MacMillan Baseball Engagement Calen-dar.* In addition to the inclusion of "Mac-Millan" as part of the title, the back cover, the title page, and the copyright page all prominently refer to the MacMillan Pub-lishing Company. The words "Babe Ruth" do not appear on the cover.

We shall attempt to describe the exhibit in dispute. Each right-hand page consists of a calendar for a given week, supplement-ed by baseball trivia linked to a particular date. Each left-hand page bears a photo-graph of a baseball player, ballfield, or other item of potential interest to fans. For example, the week of June 13 features a grinning Lou Gehrig crossing the plate after hitting a home run, while the week of October 17 displays Mickey Mantle in full swing.

This appeal concerns the inclusion of three Babe Ruth photos in the calendar. A picture of Ruth helping a small boy with his batting grip appears on its cover. The week of October 31–November 6 shows Ruth saluting General John Pershing. In addition, a baseball autographed by Ruth illustrates the week of December 5. Though they claimed no particular owner-ship interest in these specific photographs, Pirone and the other appellants (herein-after collectively referred to as "Pirone") objected to the use of Ruth's likeness.

Pirone filed suit, alleging federal and common law trademark infringement and unfair competition, infringement of the common law right of publicity, and viola-tion of the New York Civil Rights Law. Pirone sought a permanent injunction, an accounting, damages, and attorneys' fees. The district court granted MacMillan's mo-tion for summary judgment on the trade-mark infringement and unfair competition claims, *see* Fed.R.Civ.P. 56, and also grant-ed its motion to dismiss the remaining counts for failure to state a claim on which relief may be granted, pursuant to rule 12(b)(6).

## DISCUSSION

A trademark is a very unique type of property. "There is no such thing as prop-erty in a trade-mark except as a right ap-purtenant to an established business or trade in connection with which the mark is employed." *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918). Therefore, a trade-mark is "not property in the ordinary sense," but only a word or symbol indicat-ing the origin or source of a product. *In-dustrial Rayon Corp. v. Dutchess Under-wear Corp.,* 92 F.2d 33, 35 (2d Cir.1937), *cert. denied* 303 U.S. 640, 58 S.Ct. 610, 82 L.Ed. 1100 (1938). The owner of the mark acquires the right to prevent his goods from being confused with those of others and to prevent his own trade from being diverted to competitors through their use of misleading marks. "There are no rights in a trade-mark beyond these." *Id.*

To prevail on a statutory or common law trademark infringement claim a plaintiff must demonstrate an infringement of this limited property right. He must establish that the symbols in which this property

right is asserted are valid, legally protectible trademarks; that they are owned by plaintiff; and that defendant's subsequent use of similar marks is likely to create confusion as to origin of the goods. *See Estate of Presley v. Russen,* 513 F.Supp. 1339, 1362 (D.N.J.1981), and cases cited therein.

To be awarded summary judgment, MacMillan must demonstrate the absence of any material factual issue genuinely in dispute and that it is deserving of judgment as a matter of law. Fed.R.Civ.P. 56(c); *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975). The record must be construed in the light most favorable to Pirone, and all reasonable inferences must be drawn to its advantage. *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam). Bearing these principles in mind, we conclude that MacMillan carried its burden and was entitled to summary judgment on the trademark infringement and unfair competition claims.

Pirone's federal claims are based on sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a).[1] The first question we must address under the section 32(1) infringement claim is whether Pirone's registered trademark embraces the photographs at issue. Put another way, can the photos of Ruth be considered a "colorable imitation" of Ruth's registered mark?

The starting point of our examination is to determine whether a mark is eligible for protection. This Court has in the past categorized marks by their eligibility to trademark status and their relative strength.[2] While these categories can be useful, establishing a particular term or symbol as a valid trademark "depends ultimately on its distinctiveness, or its 'origin-indicating' quality, in the eyes of the purchasing public." *McGregor–Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979).

Pirone argues that it owns valid, protectible trademark rights in the image and name of Babe Ruth. Although its registration is limited to the words "Babe Ruth," Pirone would have us read her rights in that word mark to include every photograph of Ruth ever taken. We decline to do so.

█ While "words and their pictorial representations should not be equated as a matter of law, a district court may make such a determination as a factual matter," *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 257 (2d Cir.1987). Nonetheless, Pirone's position finds support in neither precedent nor common sense. Every case in which the owner of a word mark received protection against infringing use of a picture mark, or vice versa, involved a true picture mark, a single pictorial representation used repeatedly as an indication of origin.[3] For example, a picture of an overflowing stein of beer on a package of peanuts intended for the tavern trade was held to infringe the registered word mark "Beer Nuts" held by a rival

---

**1.** Under Section 32(1), defendants are liable for trademark infringement where they "use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, ... or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). Section 43(a) imposes civil liability for the "use in connection with any goods or services [of] a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same." 15 U.S.C. § 1125(a).

**2.** Arranged in ascending order of strength, these categories are: (1) generic, (2) descriptive, (3) suggestive and (4) arbitrary or fanciful. *Aber-*

crombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976); *see also Thompson Medical Co., Inc. v. Pfizer, Inc.,* 753 F.2d 208, 212–13 (2d Cir.1985) (discussing various categories). "The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *McGregor–Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979).

**3.** See cases discussed below; *see also,* 2 J. McCarthy, *Trademarks and Unfair Competition,* § 23.8 at 68 n. 10 (2d ed. 1984) (collecting cases); 3 R. Callman, *The Law of Unfair Competition, Trademarks and Monopolies,* § 20.23 at 187–91 (4th ed. 1983) (collecting cases).

supplier of similar nuts. *Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326 (6th Cir.1973). Our decision in *Mobil Oil* involved the interplay between the word mark "Pegasus" and Mobil's well known flying horse symbol which had been in use for over fifty years and was conceded to be a very strong mark. 818 F.2d at 257.

■ Unlike a stylized flying horse or similar picture marks, an individual's likeness is not a consistently represented fixed image—different photographs of the same person may be markedly dissimilar. Thus a photograph of a human being, unlike a portrait of a fanciful cartoon character, is not inherently "distinctive" in the trademark sense of tending to indicate origin. *Allen v. Men's World Outlet, Inc.*, 679 F.Supp. 360, 366 n. 12 (S.D.N.Y.1988). Under some circumstances, a photograph of a person may be a valid trademark—if, for example, a particular photograph was consistently used on specific goods. Pirone, however, asserts rights in every photograph of Ruth.

This sweeping contention resembles that rejected in *Estate of Presley v. Russen*, 513 F.Supp 1339 (D.N.J.1981). The estate of the entertainer Elvis Presley argued that his "image and likeness" was a valid mark. The District of New Jersey rejected the claim as too broad. *Id.* at 1363–64. However, the court went on to note that a particular image of Presley[4] could be a valid mark since it had been used consistently in promotional and advertising materials and thus had retained a "single and continuing commercial impression." *Id.* at 1364.

A similar analysis is appropriate here. Even if Pirone could show that it has established a trademark in a particular pictorial representation of Ruth, such a trademark would not cover all photos taken of Ruth during his career, no matter how dissimilar. Ruth was one of the most photographed men of his generation, a larger than life hero to millions and an historical figure in whom interest still runs high.

The purpose of a trademark is to designate the source of a product and it has no existence apart from the trade "in connection with which the mark is employed." *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. at 97, 39 S.Ct. at 50. It cannot be said that every photograph of Ruth serves this origin-indicating function. Since Pirone has no trademark relating to any of the photographs used in the calendar, there is no basis for liability under section 32(1).

Whatever rights Pirone may have in the mark "Babe Ruth," MacMillan's use of Ruth's name and photographs can infringe those rights only if that use was a "trademark use," that is, one indicating source or origin. As the district court correctly determined, there was no "trademark use" here.

Personal names used as trademarks are generally treated as descriptive terms, since a name might be regarded as a convenient description of the fact that the individual was affiliated with the firm. *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 104 (2d Cir.1985). As with all descriptive marks, they are thus protected "only if, through usage, they have acquired distinctiveness and secondary meaning." *Id.* Marks acquire secondary meaning when "the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business." *Id.; see also* 1 J. McCarthy, *Trademarks and Unfair Competition*, § 13:2 (2d ed. 1984). Words which are "primarily merely a surname" may not be registered without proof of secondary meaning, proof that the mark "has become distinctive of the applicant's goods." 15 U.S.C. §§ 1052(e), (f). The act of registering a proper noun as a trademark, however, "does not withdraw it from the language, nor reduce it to the exclusive possession of the registrant." *Societe Comptoir de L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dept. Stores, Inc.*, 299 F.2d 33, 36 (2d Cir.1962).

---

4. The depiction of Presley wearing a trademark jumpsuit and striking a characteristic singing stance—the "Elvis Pose"—had been used with

only minor alterations (e.g., the color of the jumpsuit). 513 F.Supp. at 1364.

This rule applies with greater force in the context of historical sports heroes.

■ Pirone's registration and use of the mark "Babe Ruth" to sell "playing cards, writing papers and envelopes" may well have created a "mental association" in consumers' minds between the mark and a single source of those products. *See* 1 J. McCarthy, § 15:2 at 659. To the extent this is true, the primary meaning of the name as words identifying a famous American has been supplemented by the secondary meaning identifying the business of selling those products. While the secondary use may be protected, the use of these words in their primary, descriptive sense may not be. *See Field Enterprises Educational Corp. v. Cove Industries, Inc.*, 297 F.Supp. 989, 995 (E.D.N.Y.1969); 1 J. McCarthy §§ 13.2, 15.2. Here, the calendar uses the name and image of Babe Ruth in the primary sense—to identify a great baseball player enshrined in the history of the game. Such use is not a trademark use and not an infringement.

■ Pirone's unfair competition claim is broader, since Section 43(a) is violated by the use of any "symbol" as a "false designation of origin" or as any "false representation," whether or not a registered trademark is involved. 15 U.S.C. § 1125(a). While these pictures of Ruth are in a sense symbols, they in no way indicate origin or represent sponsorship.

Photographs of baseball, its players and assorted memorabilia, are the subject matter of the calendar. The pictures of Ruth no more indicate origin than does the back cover's picture of Jackie Robinson stealing home plate. Both covers are merely descriptive of the calendar's subject matter. In neither case would any consumer reasonably believe that Ruth or Robinson sponsored the calendar. Instead, the photographs identify great ballplayers and by so doing indicate the contents of the calendar, not its source. The source of the publication is clearly indicated by the numerous, prominent references to MacMillan. *See Universal City Studios, Inc. v. Ideal Publishing Corp.*, 195 U.S.P.Q. (BNA) 761, 762 (S.D.N.Y.1977) (use of television series title on souvenir publication is not an infringement where use is descriptive and publication's own trademark prominently displayed); *In re Scholastic, Inc.*, 223 U.S.P.Q. (BNA) 431 (T.T.A.B.1984) (book title does not identify source, but merely the reading material found within); *In re Frederick Warne & Co.*, 218 U.S.P.Q. 345 (BNA) (T.T.A.B.1983) (cover illustration showing main character of book is clearly descriptive of book's contents, not an identification of publisher).

Moreover, even if Pirone could demonstrate that the photographs indicated origin or made a representation of sponsorship, its trademark claims would founder on the critical issue under the Lanham Act: likelihood of confusion.

It is well settled that the crucial determinant in an action for trademark infringement or unfair competition is "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978) (per curiam) (citation omitted), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). In order to be confused, a consumer need not believe that the Ruth estate actually produced the calendar. The "public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir.1979).

Normally, the likelihood of confusion is a factual question, centering on the probable reactions of prospective purchasers of the parties' goods. *American Int'l Group, Inc. v. London America Int'l Corp.*, 664 F.2d 348, 351 (2d Cir.1981). Claims, however, may be dismissed as a matter of law where "the court is satisfied that the products or marks are so dissimilar that no question of fact is presented." *Universal City Studios, Inc. v. Nintendo Co. Ltd.*, 746 F.2d 112, 116 (2d Cir.1984); *see also Rogers v. Grimaldi*, 875 F.2d 994, 1001 (2d Cir.1989) (summary judgment granted

where Lanham Act "confusion" claim raised no genuine issue requiring submission to jury). The district court concluded that Pirone "cannot possibly show confusion as to source or sponsorship" of the calendar and we agree.

The two cases upon which Pirone primarily relies are clearly distinguishable. *Dallas Cowboys Cheerleaders* involved the unauthorized use in a pornographic motion picture of the Cheerleaders' distinctive uniform, a strong indication of source in which the Cheerleaders own a trademark. We held that the public might be misled to believe that the Cheerleaders licensed defendants to use the uniform or were involved in some way with the film's production. 604 F.2d at 205. The defendants in *Warner Brothers, Inc. v. Gay Toys, Inc.,* 724 F.2d 327 (2d Cir.1983), deliberately copied the distinctive symbols which identified a car portrayed on a television series, "The Dukes of Hazzard," and used them on a toy car. The court found that consumers purchased the car "because they (or their children) identified the toy with the television series." *Id.* at 333.

Each case involved a specific arbitrary symbol that had been used over time and had become associated in the public mind with the plaintiffs. The use of the Cheerleaders' uniform or the Dukes of Hazzard insignia might well have led consumers to believe that the owners of those symbols authorized the challenged use. The same cannot be said for these photographs of Ruth—photographs of one ballplayer among the many featured in the calendar. In the context of such a compilation, an ordinarily prudent purchaser would have no difficulty discerning that these photos are merely the subject matter of the calendar and do not in any way indicate sponsorship. No reasonable jury could find likelihood of confusion.

Since Pirone failed to present a material issue of fact on the question of likelihood of consumer confusion, and for reasons already stated, we agree with Judge Leval that this case justifies summary judgment for MacMillan on the federal and common law trademark infringement and unfair competition claims.

## RIGHT OF PUBLICITY OR PRIVACY

Pirone also asserts a common law "right of publicity" claim, and asks for relief under New York's statutory right to privacy. N.Y. Civ. Rights Law §§ 50, 51. The Civil Rights Law forbids the use for advertising or trade purposes of any portrait or picture without the consent of the subject. The right of privacy protection, however, is clearly limited to "any living person." N.Y. Civil Rights Law § 50.[5] *See Smith v. Long Island Jewish–Hillside Medical Center,* 118 A.D.2d 553, 554, 499 N.Y.S.2d 167, 168 (2d Dept.1986) (right to privacy claim is personal to the individual and is extinguished upon his death).

Pirone contends there is a common law right of publicity, barring the unauthorized commercial use of a person's image or likeness, that survived the death of Babe Ruth. "No such non-statutory right has yet been recognized by the New York State courts." *Frosch v. Grosset & Dunlap, Inc.,* 75 A.D.2d 768, 768–69, 427 N.Y.S.2d 828, 829 (1st Dept.1980). In *Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 220–22 (2d Cir.1978), we expressed the view that a common law right of publicity existed under New York Law and that such a right was descendible. Since that decision, however, the New York Court of Appeals has indicated that the state statutory provisions concerning a right of publicity are exclusive. "Since the 'right of publicity' is encompassed under the Civil Rights Law as an aspect of the right of privacy, which ... is exclusively statutory in this state, the plaintiff cannot claim an independent common-law right of publicity." *Stephano v. News Group Publications,* 64 N.Y.2d 174, 183, 485 N.Y.S.2d 220, 224, 474 N.E.2d 580, 584 (1984); *see also Wojtowicz v. Delacorte Press,* 43 N.Y.2d 858, 860, 403 N.Y.S.2d 218, 219, 374 N.E.2d 129, 130 (1978) (in New

---

5. Although § 51, which creates a private cause of action to enforce the right of privacy, contains no such limitation, the "different parts of the same act, though contained in different sections, are to be construed together as if they were all the same section." N.Y. Statutes § 97.

York, "thus far there has been no recognition of such right other than under sections 50 and 51 of the Civil Rights Law"). Though *Stephano* involved a living plaintiff, and thus the Court of Appeals made no holding with respect to whether an extra-statutory right of publicity descends to the heirs of one whose picture is used for trade purposes, the Court's broad language persuades us that the views expressed in *Factors* are no longer a valid statement of New York Law.[6]

The broad language of *Stephano* has received an expansive interpretation. The New York Supreme Court has ruled that the heirs of celebrities cannot state a claim since "there is no independent common law right of publicity." *James v. Delilah Films, Inc.*, 144 Misc.2d 374, 378, 544 N.Y. S.2d 447, 450 (N.Y.Sup.Ct., 1989); *see also Antonetty v. Cuomo*, 131 Misc.2d 1041, 1045, 502 N.Y.S.2d 902, 906 (N.Y.Sup.Ct. 1986) ("right of privacy" exists solely by virtue of Civil Rights Law and does not survive death).

■ Since the New York courts have indicated clearly that the Civil Rights Law preempts any common law right of publicity action, Pirone has failed to state a claim upon which relief may be granted. Fed.R. Civ.P. 12(b)(6). Pirone's right to relief in this area lies not with us, but with the New York legislature.

Accordingly, we affirm the judgment of the district court.

---

**6.** The cryptic footnote 2 in the *Stephano* opinion, 43 N.Y.S.2d at 224 n. 2, 474 N.E.2d at 584 n. 2, creates some grounds for uncertainty as to whether New York's statutory remedy preempts an heir's common law right of publicity claim, but we believe recognition of such a right will have to await either clarification from the Court of Appeals or action by the New York legislature, which has thus far declined to amend the statute to make a right of publicity descendible.