THIS DECISION IS CITABLE AS
PRECEDENT OF THE TTAB        JUNE 12, 1997
Paper No. 18
PTH

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
————————

Trademark Trial and Appeal Board
————————

In re Sloppy Joe's International, Inc.
————————

Serial No. 74/345,270
————————

John Cyril Malloy, III of Malloy & Malloy for Sloppy Joe's
International, Inc.

Brian Weber, Trademark Examining Attorney, Law Office 106
(Mary I. Sparrow, Managing Attorney).
————————

Before Sams, Quinn and Hairston, Administrative Trademark
Judges.

Opinion by Hairston, Administrative Trademark Judge:


An application has been filed by Sloppy Joe's

International, Inc. to register the mark shown below,



for restaurant and bar services.[1]

---

[1]Application Serial No. 74/345,270 filed January 4, 1993, alleging a date of first use and date of first use in commerce of November 30, 1961.  The application contains the following statements:  "The mark consists in part of a portrait of Ernest Hemingway" and "The stippling shown in the drawing is not intended to indicate color, but rather is a feature of the mark."

Registration has been finally refused under Sections 2(a) and 2(d) of the Trademark Act. Applicant has appealed the final refusals to register. Both applicant and the Trademark Examining Attorney have filed briefs, but no oral hearing was requested.

### *I. Section 2(a) refusal*

The refusal to register under Section 2(a) of the Act, 15 U.S.C. §1052(a), is based on the contention that the mark falsely suggests a connection with author Ernest Hemingway.[2]

### *A. "False Suggestion of a Connection" and*
### *the Right of Publicity*

Before turning to the test for determining the propriety of a refusal to register under Section 2(a), we will address two arguments made by applicant that relate to the false suggestion of a connection portion of Section 2(a) and the right of publicity.

In *University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co., Inc.,* 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983), our primary reviewing court said that the "false suggestion of a connection" portion of Section 2(a) evolved out of, and embraced, the concepts of the rights of privacy

---

[2]Section 2(a) prohibits, inter alia, the registration of a mark which "consists of or comprises...matter which may...falsely suggest a connection with persons, living or dead..."

and publicity.  Applicant argues that, because the right of publicity terminates upon the death of the individual, the Section 2(a) false suggestion of a connection ground may not be asserted with respect to Ernest Hemingway, citing *Factors Etc., Inc. v. Pro Arts, Inc., 652 F.2d 278, 211 USPQ 1 (2d Cir. 1981)* [in which the Second Circuit applied Tennessee law] and *Lugosi v. Universal Pictures, 205 USPQ 1090 (Cal. 1979).*  Besides the fact that these decisions are no longer controlling, as both Tennessee and California have enacted statutes recognizing a post mortem right of publicity,[3] the Trademark Act prohibition under Section 2(a) extends to "persons, living *or dead*." (emphasis added).  We find, therefore, that the Section 2(a) false suggestion of a connection refusal is not improper here simply because it has been asserted with respect to a deceased individual, Ernest Hemingway.

Applicant, citing *Pirone v. MacMillan Inc.*, 894 F.2d 579, 13 USPQ2d 1799 (2d Cir. 1990), argues that not every picture or photograph of an individual is an invasion of the right of publicity and a violation of Section 2(a), and that the Hemingway portrait in applicant's mark is not the kind of representation which infringes Hemingway's right of publicity.  In *Pirone,* the daughters of Babe Ruth, owners of a registration for the word mark BABE RUTH for playing cards, writing papers and envelopes, and their licensees,

_____

[3]Tenn Code Ann §§47-25-1101 - 47-25-1108 and Cal Civil Code §§990 (g) and (h).

objected to the use of three photographs of Ruth in a baseball calendar published by MacMillan.  Plaintiffs alleged federal and common law trademark infringement and unfair competition, infringement of the common law right of publicity, and violation of the New York Civil Rights Law.

On the claims of federal trademark infringement and unfair competition, the Court of Appeals affirmed the district court's entry of summary judgment in MacMillan's favor, declining to hold that plaintiff's rights in the word mark BABE RUTH extended to photographs of Ruth owned by MacMillan.  At page 1803, the Court stated:

> While these pictures of Ruth are in a sense symbols, they in no way indicate origin or represent sponsorship.
>
> Photographs of baseball, its players, and assorted memorabilia, are the subject matter of the calendar.  The pictures of Ruth no more indicate origin than does the back cover's picture of Jackie Robinson stealing home plate.  Both covers are merely descriptive of the calendar's subject matter.  In neither case would any consumer reasonably believe that Ruth or Robinson sponsored the calendar.  Instead, the photographs identify great ball-players and by so doing indicate the contents of the calendar, not its source.  The source of the publication is clearly indicated by the numerous prominent references to MacMillan.  (citations omitted)

The essence of the court's ruling on these claims is not that phototgraphs or pictures of persons, per se, are not trademarks, but that the Ruth photographs, as used in

this baseball calendar, did not serve a source-indicating function.[4]  In the present case, applicant uses and seeks to register the Hemingway portrait as part of its mark for bar and restaurant services, thereby explicitly claiming the portrait functions to indicate source.  The use of the Hemingway portrait is, therefore, not analogous to McMillan's use of Ruth photographs in a baseball calendar.


### B. The Test for Section 2(a)

The test for determining the propriety of a refusal to register based on Section 2(a) has four elements.  The mark (or part of it) must be shown to be the same as or a close approximation of the person's previously used name or identity, and it must be established that the mark would be recognized as such (i.e., the mark points uniquely to that person).  Further, it must be shown that the person in question is not connected with the goods or services of the applicant, and the person's name or identity must be of sufficient fame that when it is used as part or all of the mark on applicant's goods/services, a connection with that person would be presumed by someone considering purchasing

---

[4]To be clear on this point, the court, in *Pirone*, cited to *Estate of Presley v. Russen, 513 F. Supp. 1339 (D.N.J. 1981)* wherein the District Court for New Jersey noted that a particular image of Elvis Presley, i.e., Presley wearing a jumpsuit and striking a characteristic singing stance, could be a valid mark since it had been used consistently in promotional and advertising materials and thus had retained a "single and continuing commercial impression."

the goods/services. *Buffett v. Chi-Chi's, Inc.,* 226 USPQ 428 (TTAB 1985).

Applicant maintains that there is a real connection between Ernest Hemingway and applicant's bar, and therefore there is no "false suggestion" of a connection between Hemingway and applicant's services. Further, applicant argues that Hemingway is an historical figure, known for his writing, an activity unrelated to bar and restaurant services, and prospective purchasers of applicant's services would not presume a connection between Hemingway and such services. Lastly, applicant argues that Hemingway family members have impliedly consented to applicant's registration of the involved mark for bar and restaurant services.

Turning to applicant's first argument, applicant maintains that Hemingway is connected with applicant's bar and restaurant by virtue of his close association with the bar and its original owner. In support of its position, applicant has submitted the declaration of its president, Michael Halpern; a booklet entitled *Sloppy Joe's Bar The First Fifty Years* by Sharon Wells, a Key West, Florida historian; and copies of excerpts from books, brochures, and newspapers which chronicle Hemingway's years in Key West. According to these materials, Hemingway and Joe Russell, the original owner of Sloppy Joe's bar, were close friends. It is said that Hemingway modeled the main character in his novel *To Have and To Have Not* after Russell. Hemingway was a frequent patron of Sloppy Joe's, did a great deal of his

7

writing in the back room of the bar; and after his death, original manuscripts and sections of several of his most famous works were discovered there. In the Wells' booklet and another of the excerpted materials, Hemingway is quoted as saying: "I used to be co-owner of Sloppy Joe's, silent partner they call it. We had gambling in the back and that's where the real money is." Applicant argues that the refusal to register under Section 2(a) is improper because the "connection between Hemingway and Sloppy Joe's is not falsely suggested." (November 24, 1993 response to Office action, p. 2).

The Examining Attorney acknowledges that "[F]ew cases, if any, have dealt with the issue of how much of a connection is required to overcome a Section 2(a) refusal." It is the Examining Attorney's position, however, that a financial or ownership interest in the goods and/or services is required. The Examining Attorney argues that,

> .....spending a great deal of time in one's
> favorite bar is not a legally sufficient
> "connection" to allow an establishment to secure
> trademark rights in its famous patron's likeness.
> Hemingway may have had his own barstool and even
> maintained an office for writing in the back room,
> but there is no evidence that he had any actual
> proprietary or financial interest in the bar.
> The claims of co-ownership listed by the applicant
> seem to refer more to folklore based on the amount
> of time Hemingway spent in the bar than to any
> actual ownership interest.
>
> Brief, pp. 3-4.

The question here is whether applicant has established a "connection" with Hemingway which entitles it to register the involved mark. Although the legislative history of Section 2(a) offers no specific guidance on this issue, we are inclined to agree with the Examining Attorney that Hemingway's friendship with the original owner of Sloppy Joe's bar, his frequenting the bar and his use of the back room as an office is not the kind of "connection" contemplated by Section 2(a). Rather, a commercial connection, such as an ownership interest or commercial endorsement or sponsorship of applicant's services, would be necessary to entitle applicant to register the involved mark. As to Hemingway's purported claim of co-ownership of the bar, we agree with the Examining Attorney that this appears to be mere folklore. Applicant has offered no documentary evidence, e.g., a deed or contract, to support its contention that Hemingway was indeed the co-owner of the bar. Thus, applicant has not established a connection with Hemingway which entitles it to register the involved mark.

We turn next to applicant's argument that prospective customers of its bar and restaurant services would not presume a connection between Hemingway and such services because (1) Hemingway is known only for his writing and (2) Hemingway is an historical figure.

As the Examining Attorney correctly observes, the names and likenesses of well known persons frequently are licensed for use on various goods and services. See, e.g.: *In re*

9

*Sauer,* 27 USPQ2d 1973 (TTAB 1993) [Record included Bo Jackson baseball and football cards and advertisements for Bo Jackson figurines and toys.]; *Buffett v. Chi-Chi's, supra* [Record included evidence of licensing agreements held by Jimmy Buffett for the name "J. B.'s MARGARITAVILLE" for a restaurant, and for the sale of clothing.]; and *McFarland v. Miller,* 29 USPQ2d 1586 (3d Cir. 1994) [Court noted that George McFarland ("Spanky" of the "Little Rascals") actively protected the right to license his name.] Thus, the name and/or likeness of a well known writer may well be "extended" for use on goods and services unrelated to writing. Additionally, as evidenced by the materials submitted by applicant, Hemingway's frequenting Sloppy Joe's bar and his "hard drinking" are well documented.

We are not persuaded by applicant's argument that, because Hemingway is an historical figure, customers are not likely to connect Hemingway with applicant's bar and restaurant services. Applicant relies on *Lucien Picard Watch Corp. v. Since 1868 Crescent Corp.*, 314 F.Supp. 329, 165 USPQ 459, 461 (S.D.N.Y. 1970) [Use of the mark Da Vinci on jewelry and leather giftware "is scarcely likely to mislead" a significant number of purchasers into believing that Leonardo da Vinci was in any way responsible for the design or production of the goods; thus no false suggestion of a connection with Leonardo da Vinci]. The facts here are distinguishable. Hemingway, who died just under 40 years ago, is a figure--and celebrity--of our own times; many

10

people who knew him are undoubtedly still living.  Hence, he is not "historical" in the way Leonardo da Vinci is "historical."

We have no doubt that prospective purchasers of applicant's services will recognize the face in the mark as a portrait of Hemingway.  Such recognition is implicit in applicant's description of its mark and the fact that applicant is a sponsor of celebrations and festivals honoring Hemingway's life and work.  Applicant bills itself as the "Home of the 'Papa' Hemingway Look-Alike Contest." Also, Mr. Halpern, applicant's president, states in his declaration that the picture in applicant's mark is a sketch of Hemingway.  All this evidences applicant's intent to suggest a connection with Hemingway.  "Evidence of such intent would be highly persuasive that the public will make the intended false association."  *Notre Dame, supra* at 217 USPQ at 509.

We find, therefore, that, when the portrait of Hemingway is used as part of the mark for applicant's bar and restaurant services,  prospective purchasers would presume a connection between Hemingway and applicant's services.

### *C. Implied Consent*

The final argument pressed by applicant is that there is no false suggestion of a connection here because members of the Hemingway family have consented to applicant's use of Hemingway's name and likeness in connection with applicant's

11

bar and restaurant.  Applicant implies this consent from the attendance and participation of Hemingway family members at celebrations and festivals sponsored by applicant which honor Hemingway's life and work.

We agree with the Examining Attorney, however, that no consent to **register** the involved mark can be implied by the mere attendance and participation of some Hemingway family members at these events.  We have no basis on which to conclude that such family members are authorized to consent to the registration of Hemingway's likeness for the involved services.  In this regard, we note that apparently a separate entity, Hemingway, Ltd., the owner of a registration for the mark HEMINGWAY for services identified as "licensing others the right to use and/or exploit the name and likeness of Ernest Hemingway," has authority to license the use of the name and likeness of Ernest Hemingway.

Since all of the elements of the test for refusal under Section 2(a) have been met, the refusal to register is affirmed.

*II. Section 2(d) refusal*

Registration has been refused under Section 2(d) of the Trademark Act, 15 U.S.C. §1052(d), on the ground that the use of applicant's mark for its identified services is likely to cause confusion with the registered marks below, owned by the same entity, for the following goods and services:

| | |
|---|---|
| HEMINGWAY | licensing others the right to use and/or exploit the name and likeness of Ernest Hemingway[5] |
| HEMINGWAY'S | bar and restaurant services[6] |
| HEMINGWAY'S | bar and restaurant services[7] |

---

[5]Registration No. 1,681,383 issued March 31, 1992.
[6]Registration No. 1,765,090 issued February 2, 1992 under the provisions of Section 2(f).
[7]Registration No. 1,220,452 issued December 14, 1982 on the Supplemental Register.  Section 8 affidavit filed.

HEMINGWAY                    men's and women's outdoor
                            clothing, namely, underwear,
                            swimwear, pajamas, night-
                            gowns, robes, socks, shirts,
                            t-shirts, sweatshirts,
                            sweaters, pants, sweatpants,
                            dresses, skirts, shorts,
                            jumpsuits, jackets, rain-
                            coats, vests, hats, gloves,
                            ties and scarves[8]

### A. The Marks

In this case, we find that applicant's mark is similar to the cited marks HEMINGWAY and HEMINGWAY'S.

In a composite mark, it is generally the word portion that is dominant. *In re Appetito Provisions Co.*, 3 USPQ2d 1553 (TTAB 1987). We do not believe it appropriate, however, to apply this rule to applicant's mark, given the prominence of the design element, and the fact that it is a recognizable portrait of a well known person, Ernest Hemingway. The Hemingway portrait is not an ancillary or subordinate design. As used on the specimens of record, (the front of a menu is shown below in reduced size), the Hemingway portrait is especially eye-catching.

---

[8]Registration No. 1,384,390 issued February 25, 1986; Section 8 affidavit filed.

Prospective customers viewing applicant's mark would be just as likely to remember the Hemingway portrait, and consequently the name Hemingway, as the words SLOPPY JOE'S. In this regard, it is established that a picture and its literal equivalent are given the same significance in determining likelihood of confusion. See Shunk Manufacturing Co., 318 F.2d 328, 137 USPQ 881, 883 (CCPA 1963) [caricature representation of Scotchman, i.e., man in kilts and Scottish garb, and word SCOTCHMAN for mechanical equipment]; Izod Ltd. v. Zip Hosiery Co., Inc., 405 F.2d 575, 160 USPQ 202, 204 (CCPA 1969) [representation of head of tiger-like animal and words TIGER HEAD for clothing]; and In re Rolf Nilsson AB, 230 USPQ 141, 143 (TTAB 1986) [design of a lion's head silhouette and the word LION]. Thus, when we compare the marks in their entireties, with appropriate weight given to the word and design elements in applicant's

mark, we find that the marks are similar and that when used on identical or related goods/services, confusion is likely to occur. We have kept in mind that under actual marketing conditions, consumers do not necessarily have the opportunity to make a side-by-side comparison between marks.

## B. The Goods/Services

Having found that the parties' marks are similar, we have no difficulty concluding that applicant's use of its mark in connection with bar and restaurant services is likely to cause confusion with registrant's marks for identical services. The more difficult question is whether applicant's bar and restaurant services are sufficiently related or connected to registrant's licensing services and clothing such that when these goods/services are offered under the parties' respective marks, confusion is likely to occur.

Goods and/or services need not be identical or even competitive in nature in order to support a finding of likelihood of confusion. It is sufficient for the purpose that the goods and/or services are related in some manner; or that they are marketed under such conditions that they would be encountered (bearing similar marks) by the same persons in an environment conducive to likelihood of confusion; or that the record shows that special conditions or circumstances exist sufficient to support the inference that purchasers encountering applicant's services bearing

16

its mark would be likely to mistakenly assume that applicant's services are in some way connected with the registrant. *Turner Entertainment Co. v. Nelson,* 38 USPQ2d 1942 (TTAB 1996) and *In re Phillips-Van Heusen Corp.*, 228 USPQ 949 (TTAB 1986) and cases cited therein. Special circumstances exist here which support the inference that purchasers encountering applicant's bar and restaurant services bearing its mark would be likely to mistakenly assume that these services are in some way connected with registrant.

As previously noted, the licensing of the names and/or likenesses of well known persons for use on various goods and services is a common practice. Indeed, this is reflected in registrant's registrations which cover the licensing of Hemingway's name and/or likeness (with no limitation as to the goods/services which may be licensed thereunder), bar and restaurant services, and clothing. In view thereof, and because the public is accustomed to seeing the names and likenesses of well known individuals on diverse items, it would be reasonable for consumers to believe that bar and restaurant services and licensing services for the name and/or likeness of a well known person and clothing emanate from the same source. Under these circumstances, we find that applicant's bar and restaurant services and registrant's licensing services and clothing are connected in such a way that when offered under similar marks, confusion is likely to occur.

17

In sum, customers familiar with registrant's HEMINGWAY and HEMINGWAY'S marks as used in connection with licensing services, bar and restaurant services, and clothing, upon encountering applicant's mark consisting of SLOPPY JOE'S and a prominent portrait of Ernest Hemingway, for bar and restaurant services, would be likely to believe, mistakenly, that the goods and services originate with or are sponsored by the same source.

**Decision**:  The refusals to register under Section 2(a) and 2(d) of the Trademark Act are affirmed.

J. D. Sams

T. J. Quinn

P. T. Hairston
Administrative Trademark
Judges, Trademark Trial and
Appeal Board