PHILLIPS–VAN HEUSEN CORP., Calvin Klein, Inc., and Calvin Klein Trademark Trust, Plaintiffs,

v.

CALVIN CLOTHING COMPANY, INC., and Star Ride Kids, Inc., Defendants.

No. 05 Civ. 6802(JSR).

United States District Court, S.D. New York.

Aug. 11, 2006.

Edward Elmo Vassallo, James Martin Gibson, Tila Marie Duhaime, Timothy J. Kelly, Fitzpatrick, Cella, Harper & Scinto, New York, NY, for Plaintiffs.

Anthony F. Lo Cicero, Marc Jonathan Jason, Amster, Rothstein & Ebenstein LLC, New York, NY, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RAKOFF, District Judge.

Before anyone had even heard of the name "Calvin Klein," a small clothing manufacturer named Calvin Clothing Company registered the trademark "Calvin" to identify its tailored boys' apparel. Decades later, Calvin Clothing Company, now under new ownership, sought in various ways to widen its use of the name "Calvin" to other lines of clothing, thus precipitating this lawsuit brought under the Lanham Act, 15 U.S.C. § 1114 *et seq.*, and New York statutory and common law. Specifically, plaintiffs Phillips–Van Heusen Corp. and its subsidiaries Calvin Klein, Inc. and Calvin Klein Trademark Trust (collectively, "Calvin Klein") contend that defendants Calvin Clothing Company, Inc. and Star Ride Kids, Inc. (collectively, "Calvin Clothing") abandoned whatever rights Calvin Clothing may have once had in a broader use of its "Calvin" mark, that Calvin Klein has acquired common law rights in the "Calvin" mark for all goods other than boys' tailored apparel, that Calvin Clothing's registration and attempted registration of "Calvin" and Calvin-related marks for other lines of clothing is unlawful, and that Calvin Clothing's use of the "Calvin" mark beyond boys' tailored apparel infringes Calvin Klein's marks. Calvin Clothing, in turn, seeks a declaration that Calvin Klein has no rights in the "Calvin" mark and further claims that Calvin Klein's use of that mark violates Calvin Clothing's rights under the Lanham Act and New York common law.

Following discovery and motion practice, the Court conducted a one-week bench trial, on the basis of which it hereby makes the following findings of fact and conclusions of law:

*Findings of fact.* Defendants' predecessors registered and first used their "Calvin" mark on boys' tailored clothing in the 1930s and expanded their use of the mark to mens' tailored clothing in or around the late 1960s. Stipulation dated May 4, 2006 ("Stip.") ¶¶ 49, 54.[1] Plaintiffs' predeces-

---

1. At some point, there developed a category    called "students' tailored clothing." While in

sors first registered and then used the "Calvin Klein" mark on women's apparel in the late 1960s, and subsequently expanded their use of the mark to encompass all lines of apparel, as well as numerous other products. *Id.* ¶¶ 19–32.

For several decades thereafter, the two companies co-existed in relative peace. Although each side occasionally protested the other's use of the name "Calvin" in connection with one or another advertising campaign, and sometimes even threatened litigation, no litigation actually ensued. *See* Plaintiffs' trial exhibit ("Pl.Ex.") 71. Indeed, on a few occasions, defendants' predecessors expressly agreed to allow Calvin Klein to use the "Calvin" mark on certain specified products, provided certain conditions were met. *Id.*

From the late 1960s onward, Calvin Klein expended ever greater sums to publicize its "Calvin Klein" mark. Stip. ¶¶ 36–38; Trial Transcript ("tr.") at 85–88; Pl. Ex. 11, at R; Pl. Exs. 6, 24. In recent years, plaintiffs have incurred yearly expenditures of approximately $200 million to advertise and promote the "Calvin Klein" brand around the world. Tr. at 87. Concomitantly, retail sales of Calvin Klein goods have grown greatly and now total billions of dollars yearly. Tr. at 41, 43. As defendants concede, "Calvin Klein" is today one of the most recognized brand names in the apparel industry. Stip. ¶¶ 39–41.

Beginning in the 1980s, Calvin Klein began to occasionally refer to its women's jeans as "Calvins." The most well-known of these advertisements was the controversial 1980s commercial in which an underage Brooke Shields, wearing tight-fitting jeans, suggested that nothing came between her and her "Calvins." Pl.Ex. 23. Never one to forego an opportunity to leer, the media began to use the name "Calvin" to refer to various Calvin Klein apparel, a usage that has continued to the present. Pl.Ex. 14. In addition, Calvin Klein thereafter made further occasional use of the "Calvin" name to identify its products, such as in a 1990s campaign featuring Marky Mark. *See* deposition of Kimberly Vernon dated August 5, 2003, at 30;[2] Tr. at 75; Pl.Ex. 21.

By contrast, Calvin Clothing's predecessors largely limited their use of their registered "Calvin" mark to boys' tailored clothing, although, as noted, they occasionally used it on men's tailored clothing as well. Stip. ¶ 54. In the late 1990s, however, Calvin Clothing, now under new ownership, obtained four new registrations from the U.S. Patent and Trademark Office ("PTO"), and attempted to obtain six others, that would have permitted defendants to use the "Calvin" name on a much broader array of apparel.[3] Stip. ¶¶ 105–10.[4]

some contexts this might be a kind of men's tailored clothing, the Court finds that in the case of Calvin Clothing it was really a subset of boys' tailored clothing that Calvin Clothing marketed to students of high school age or younger. Such limited usage is hereinafter incorporated by reference as part of Calvin Clothing's permissible use of the mark "Calvin" on boys' tailored clothing. *See* Stip. ¶ 54.

2. Although the parties offered certain objections to small portions of the deposition excerpts offered at trial, the Court finds that none of the objections relates to deposition testimony that is material to this Court's findings of fact and, accordingly, the Court has not undertaken to rule on the objections.

3. Calvin Klein has filed actions with the PTO to cancel the four approved registrations and to force abandonment of the other six. Those proceedings have been stayed pending resolution of this action.

4. Certain additional findings of fact beyond those made above are for convenience set forth below in connection with the Court's conclusions of law.

■ *Conclusions of Law.* Calvin Klein has acquired common law rights in the Calvin mark for all apparel except boys' tailored clothing. "[T]he general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). To qualify as a trademark, a name or mark must be "used by a person . . . to identify and distinguish his or her goods." 15 U.S.C. § 1127. A personal name may be registered only if, "through usage, [it has] acquired distinctiveness and secondary meaning." *See Pirone v. MacMillan, Inc.*, 894 F.2d 579, 583 (2d Cir.1990) (internal quotation marks omitted). To determine whether a mark has acquired secondary meaning, the Court may consider a number of factors, including "advertising expenditures; consumer studies linking the name to a source; sales success; unsolicited media coverage of the product; attempts to plagiarize the mark; and length and exclusivity of the mark's use." *Thompson Med. Co. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir.1985) (internal citations omitted).

■ As a preliminary matter, defendants contend that Calvin Klein is precluded from obtaining common law rights in the "Calvin" mark because of defendants' predecessors' prior uses of the "Calvin" mark on boys' and men's apparel. It is undisputed that, prior to the mid–1990s, defendants never made use of the mark on any other lines of apparel, but defendants argue that they nonetheless maintained a right to expand their use of the mark into its "natural zone of expansion." However, even assuming, *arguendo*, that defendants once had such rights, "[w]hen a senior user delays in enforcing its rights, a junior user may acquire a valid trademark in a related field enforceable against even the senior user." *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 217 (2d Cir.2003). After years of relatively passive quiescence in the face of the explosive growth of Calvin Klein in the overall apparel industry and the corresponding notoriety of the associated name of "Calvins," the defendants may not now claim a right to expand their use of the mark into other lines of apparel. Indeed, it is noteworthy that even though defendants' predecessors sent a few letters to Calvin Klein at various times between 1975 and 1983 objecting to plaintiffs' use of the name "Calvin" on specific goods and in specific advertisements,[5] they raised no objections to some of Calvin Klein's most prominent uses of the "Calvin" mark, as on the Brooke Shields advertisement, never commenced litigation, and largely ceased making objections after 1983. Pl.Ex. 71.[6] Thus, plaintiffs can claim rights in the "Calvin" mark if they can show use of the mark, and the existence of secondary meaning, prior to defendants' more recent uses of the "Calvin" mark in the late 1990s.

It is undisputed that Calvin Klein is one of the most famous names in fashion today,

---

5. As a result, in 1981 and 1983, respectively, Calvin Klein sought Calvin Clothing's assent to its use of the "Calvin" mark on its cosmetics line and on a line of men's activewear, and in that regard Calvin Klein made some assurances that it would market these products only in conjunction with the full "Calvin Klein" trademark and that Calvin Klein Cosmetics Corp. would not seek to register the "Calvin" mark. Even assuming, *arguendo*, that these context-specific assurances were then binding on Calvin Klein, they do not in any way preclude Calvin Klein from seeking more general rights in these marks over twenty years later.

6. After the mid–1980s, the only non-trivial contacts between the parties were some abortive oral negotiations beginning around 2000. Tr. at 60–62.

that the brand's annual sales are substantial, and that there is considerable secondary meaning associated with the name "Calvin Klein." While Calvin Klein has not generally marketed products under the "Calvin" name alone, it has used that name to identify itself to the public in various advertising campaigns, including not only the Brooke Shields advertisement of the early 1980s but also a 1990s advertising campaign featuring Marky Mark.

■ Following Calvin Klein's first use of the "Calvin" mark in the 1980s, the media also began using the nickname to refer to the brand, and this use has persisted through the years. *See* Pl.Ex. 14. As noted in *National Cable Television Association v. American Cinema Editors, Inc.*, 937 F.2d 1572 (Fed.Cir.1991), "abbreviations and nicknames of trademarks or names used *only* by the public give rise to protectible rights in the owners of the trade name or mark which the public modified. Such public use by others inures to the claimant's benefit and, where this occurs, public use can reasonably be deemed use 'by' that party in the sense of a use on its behalf." *Id.* at 1577–78 (internal footnote omitted). Here, the Court finds that the public strongly associates the name "Calvin" with the Calvin Klein brand and has done so from the 1980s to the present. *See, e.g.,* Pl.Ex. 74 (when prompted with the line, "I say Calvin, you say . . .," 48 of 48 participants responded with the name "Klein"); Pl.Ex. 79 (finding 23–59% of respondents believed that products bearing the name "Calvin" were produced by Cal-

vin Klein); Pl.Ex. 11, at M (*New York Times* crossword with the clue "Calvins, e.g." and the answer "blue jeans").

Accordingly, plaintiffs have acquired common law rights in the name "Calvin" as to all lines of apparel in which defendants do not have prior rights. The Court concludes that such prior rights extend only to boys' tailored apparel (including "students' tailored clothing" as previously defined as a subset of boys' tailored clothing).

■ Specifically, the Court finds that, even though defendants' predecessors did register the "Calvin" mark for use on "men's suits and men's sportcoats" in 1976, Stip. ¶ 58, defendants subsequently abandoned that registration. A trademark is deemed abandoned if "its use has been discontinued with intent not to resume such use," and non-use for three consecutive years is *prima facie* evidence of abandonment. 15 U.S.C. § 1127. Here, James Murray, the national sales manager and one of the executive officers of Calvin Clothing's menswear division from approximately 1983 to approximately 1993, testified that Calvin Clothing did not make any sales of men's clothing under the "Calvin" label during his tenure with the company.[7] Tr. at 255–58. Rather, defendants during this period were largely engaged in making clothing for other brands, such as Austin Hill and Evan Picone. *Id.* at 259. While some items of their men's clothing may have borne the mark "CFM Calvin for Men," use of that mark, for which defendants owned a separate trademark, cannot prevent abandonment of the "Calvin" mark.[8] *Cf. Ilco Corp. v. Ideal Sec.*

7. Although Murray testified that the label *might* have been available upon request, "sporadic licensing for essentially non-commercial uses of a mark is not sufficient use to forestall abandonment." *Silverman v. CBS, Inc.*, 870 F.2d 40, 48 (2d Cir.1989). As for the contrary evidence offered by defendants, the Court finds it non-credible. Moreover, with immaterial exceptions, such testimony came from individuals whose association with defen-

dants' predecessors ended, at the latest, in the early 1990s. Thus, even were the Court to credit this testimony, there would still be a period of over three years in which defendants did not use the mark.

8. Moreover, it is not even clear that the company regularly sold goods under the "Calvin for Men" label. *See* tr. at 255–58 (James Murray's testimony that the brand would

*Hardware Corp.*, 527 F.2d 1221, 1224 (C.C.P.A.1976) (holding that use of one mark can inure to the benefit of a related mark only if they provide a "single and continuing commercial impression").

Accordingly, defendants have abandoned their rights in the mark "Calvin" for men's apparel,[9] and plaintiffs have acquired rights in that mark with respect to all apparel except boys' tailored clothing.

■ As to plaintiffs' claims of trademark infringement under federal and state law, false designation of origin under federal law, and unfair competition under New York General Business Law § 349, the touchstone of these claims is a likelihood of consumer confusion as to product authenticity or origin. In determining whether there is a likelihood of confusion, the Court turns to the familiar "Polaroid" factors: "the strength of [the] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers." *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.1961).[10]

Here, after over twenty years of substantial advertising and media attention, plaintiffs' "Calvin Klein" and "Calvin"

marks are indisputably strong (the first factor). Further, they are substantially similar to the marks employed by defendants (the second factor). Although there are additional words and symbols appended to the name Calvin in defendants' new marks (*e.g.*, "Calvin Collection," "Calvin America"), the "Calvin" name is the dominant feature shared by the marks, and it is that aspect of the marks that makes them distinctive, as defendants themselves acknowledge. *See, e.g.*, Defendants' Proposed Findings of Fact ¶ 60 (noting that "both [of plaintiffs' consumer confusion surveys] concluded that the ingredient causing confusion was the word 'Calvin' "). Although plaintiffs may market their goods in somewhat higher-end establishments than defendants, both parties produce goods in the same field, that is, apparel, and defendants apparently intend to expand their use of the mark into many, if not all, of the lines of apparel in which plaintiffs currently market their products (the third and fourth factors). Further, while plaintiffs presented no direct evidence of actual confusion, they did present consumer surveys that provide strong circumstantial evidence of such confusion (the fifth factor). *See, e.g.*, *PPX Enters. v. Audiofidelity Enters.*, 818 F.2d 266, 271 (2d Cir.1987). For example, the "Ford" survey, which used actual specimens of apparel marketed by defendants or their

have been "available," but "wasn't marketed," and wasn't "ever sold by my sales team").

9. Because the Court finds that defendants abandoned this trademark, it need not determine whether, as plaintiffs claim, defendants' new principal, James Alperin, committed fraud on the PTO when he signed the renewal application for this registration.

10. Defendants correctly point out that their recent registrations of several "Calvin" marks is *prima facie* evidence of "the validity of the registration ... [and] of the registrant's own-

ership of the mark." *See Goya Foods, Inc. v. Tropicana Prods., Inc.*, 846 F.2d 848, 854 (2d Cir.1988). However, "[t]hese presumptions are ... rebuttable, and by obtaining ... a federal registration a party does not significantly affect the course of an infringement action." *Id.* Further, the fact that Calvin Klein has, in filing registrations for the "Calvin Klein" mark in the past, taken the position that no other entity uses the mark "in such near resemblance thereto as to be likely ... to cause confusion" is immaterial to the Court's determination of whether there is, at present, a likelihood of confusion between the two marks.

licensees, showed net confusion levels ranging from 23% to 59%.[11] *See, e.g., RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058, 1061 (2d Cir.1979) (affirming a likelihood of confusion where the evidence included, *inter alia,* a consumer survey showing levels of confusion between 15 to 20 percent).

As to the junior user's bad faith, although the Court does not find that the defendants acted in bad faith (sixth factor), there is some evidence that defendants supported plaintiffs' use of the Calvin mark because it *might* ultimately benefit their own use of the mark. *See* Deposition of James Alperin dated October 20, 2005, at 42 ("My understanding is that for no monetary consideration we provided Calvin Klein Incorporated the right to use the Calvin name for its fragrance business, and I assume the consideration that we expected to receive was publicity that would help our brand."). Finally, the Court finds that defendants' products are of a somewhat lower quality than plaintiffs (the seventh factor), *see* Pl.Ex. 79 (consumer comments to that effect), and that (notwithstanding plaintiffs' own hype) the average clothing customer is not particularly sophisticated (the eighth factor). Thus, considering all of these factors, the Court determines that there is a likelihood of confusion between plaintiffs' marks and defendants' new Calvin marks, and that defendants are therefore liable for federal and state trademark infringement, false designation of origin, and unfair competition under state law. Because, however, the Court determined as part of the prior

motion practice in this case that plaintiffs had failed to show actual damages, and because the Court finds no evidence of willful infringement, this finding of liability is only relevant to injunctive and declaratory relief.

■ As to plaintiffs' claims of trademark dilution under federal law, plaintiffs must show that defendants used the "Calvin" mark after it had become famous, and that their use "causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c)(1). In contrast to the infringement context, a likelihood of dilution is insufficient, and plaintiffs can prevail only if they can show "actual dilution." *Moseley v. V Secret Catalogue, Inc.,* 537 U.S. 418, 433, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003).[12] Here, plaintiffs offer the results of their consumer confusion studies as evidence of actual dilution, but "the mere fact that consumers mentally associate the junior user's mark with a famous mark is not sufficient to establish actionable dilution." *Id.* Because plaintiffs have offered no evidence to show that defendants' use of a similar mark has "reduce[d] the capacity of [plaintiffs'] mark to identify" clothing and other goods manufactured by plaintiffs, *id.,* the plaintiffs have failed to show federal trademark dilution.

■ As to plaintiffs' claim for dilution under New York state law, however, "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name" is sufficient to establish a ground for injunctive relief. N.Y.G.B.L. § 360–*l; see also Louis Vuit-*

---

11. Although defendants argue that Dr. Ford should have used a separate test cell in his surveys and paid greater attention to whether the products here in issue were sold at the shopping locations where he selected his survey participants, they acknowledge that these surveys were "designed in accordance with the generally accepted standards and procedures for survey research." Stip. ¶ 119.

12. Although there is a presumption of dilution when marks are identical, *see, e.g., Savin Corp. v. Savin Group,* 391 F.3d 439, 452–53 (2d Cir.2004), plaintiffs do not argue that the marks here in issue are identical for dilution purposes.

*ton Malletier v. Dooney & Bourke, Inc.,* 454 F.3d 108, 119 (2d Cir.2006). To determine whether there has been dilution under New York state law, courts typically consider the following six factors: "1) similarity of the marks, 2) similarity of the products covered, 3) sophistication of the consumers, 4) predatory intent, 5) renown of the senior mark, 6) renown of the junior mark." *Sports Auth. v. Prime Hospitality Corp.,* 89 F.3d 955, 966 (2d Cir.1996) (applying New York law). The Court has considered all of these factors, and because of the substantial similarity between the marks and the products on which they are used, the Court determines that there is a likelihood of dilution, and plaintiffs have proven their claim of dilution under state law.

Having considered all of the defendants' other arguments and finding them without merit,[13] the Court hereby finds for plaintiffs on all claims except count 6, and concomitantly, dismisses defendants' counterclaims with prejudice, but the Court further finds that there has been no showing of actual damages or willful infringement, and that the only relief to which plaintiffs are entitled is as follows:

Defendants Calvin Clothing Company Inc. and Star Ride Kids, Inc. are hereby ordered to file express abandonments, with prejudice, for trademark applications Serial Nos. 76/029,753; 76/029,754; 75/447,627; 75/477,628; 76/365,813; and 76/365,814. The Commissioner for Trademarks is directed to cancel U.S. Trademark Registration Nos. 1,039,306; 2,453,672; 2,573,181; 2,573,182; and 2,573,183. Defendants are hereby enjoined, on pain of contempt, from

selling, offering for sale, advertising or distributing any clothing, other than boys' tailored apparel, that bears the mark "Calvin" or any modification thereof that is likely to cause confusion with plaintiffs' registered "Calvin Klein" trademarks and common law "Calvin" marks.

Clerk to enter judgment.

SO ORDERED.

---

13. For example, their claim of laches borders on the frivolous, given that although defendants first filed their intent-to-use registrations with the PTO in 1998, Stip. ¶ 106, much of their actual use did not begin until much more recently, *id.* ¶ 117. Accordingly, the Court determines that defendants' prejudice from the delay is minimal. Further, "the public good is of paramount importance when considering the equitable defense of laches," *Conopco, Inc. v. Campbell Soup Co.,* 95 F.3d 187, 193 (2d Cir.1996), and here the Court concludes that it would not be in the public interest to permit defendants' continued use of the "Calvin" marks when such usage is likely to cause confusion.