NOVA WINES, INC., Plaintiff,

v.

ADLER FELS WINERY LLC, Saal Brown, Inc. dba Pacific Licensing, Gary Saal, Tom Kelly Studios, Inc. and Does 1 Through 10, Defendants.

No. C 06–06149 MHP.

United States District Court, N.D. California.

Dec. 4, 2006.

Anthony B. Leuin, Erick Charles Howard, Shartsis Friese & Ginsburg LLP, San Francisco, CA, for Plaintiff.

Leo Edward Lundberg, Jr., Surjit P. Soni, Mark Leon Sutton, Michael Danton Richardson, Attorney at Law, Pasadena, CA, for Defendants.

### MEMORANDUM & ORDER

### Re: Plaintiff's Motion for Preliminary Injunction

PATEL, District Judge.

On September 29, 2006, plaintiff Nova Wines, Inc. ("Nova" or "plaintiff") brought this action against defendants Adler Fels Winery LLC ("Adler Fels"), Saal Brown, Inc. dba Pacific Licensing ("Pacific Licensing"), Gary Saal ("Saal"), and Tom Kelly Studios, Inc. ("TKS") (collectively "defendants") asserting claims for trademark infringement, trade dress infringement, unfair competition and passing off. Now before the court is plaintiff's motion for a preliminary injunction. Having considered the parties' arguments and for the reasons stated below, the court enters the following memorandum and order.

*BACKGROUND*

Plaintiff Nova Wines, a St. Helena, California winery, does business as Marilyn Wines and sells wines bearing photographs of Marilyn Monroe. Plaintiff has produced wine under the Marilyn Merlot brand name since 1987, the Marilyn Cabernet brand name since 1993, the Norma Jeane brand name since 1998 and the Velvet Collection brand name since 2004. Holder Dec. ¶ 6, Exhs. B–E. The Velvet Collection wine is sold either in 1.5–liter single bottles, or in a three-bottle "premium" set which includes 3–liter, 1.5–liter and 750–milliliter sizes. Richardson Dec. ¶ 8, Exh. 24. Since 1989, plaintiff has held an exclusive license to use, on wine, the registered trademark "Marilyn Monroe," as well as common law trademarks for Monroe's name, image and likeness from the Monroe estate. Howard Dec. ¶ 1, Exh. A; Strasberg Dec. ¶ 2. Plaintiff has been the sole winery using photographs of Marilyn Monroe on wine for nearly twenty years. Holder Dec. ¶ 3.

Defendant TKS holds copyrights for a series of nude photographs taken of Marilyn Monroe by Tom Kelley, Sr., in 1949. Saal Dec. ¶ 9, Exh. 6. While Marilyn Monroe was still alive, she signed a model release consenting to use of her "name, portraits, and pictures and reproductions thereof" of the photographs taken by Kelley. *Id.* at ¶ 18, Exh. 12. Defendant Saal Brown, Inc., doing business as Pacific Licensing, is the licensing agent for TKS. Saal Dec. ¶ 2. In 1999 or 2000, TKS began using the term "Red Velvet Collection" as a trademark for the collection of Kelley photographs. *Id.* at ¶ 4; Richardson Dec. ¶ 4, Exh. 21. In August 2000, TKS applied to register the term "Red Velvet Collection" as a trademark. *Id.* at ¶¶ 5–6, Exh. 22. TKS ultimately abandoned its registration application. *Id.* In September 2003, Pacific filed a fictitious business name statement with the Sonoma County Clerk for the term "Red Velvet Collection" for use in licensing and promoting the Kelley photographs. Saal Dec. ¶ 5, Exh. 1.

In 1999 Pacific first contacted plaintiff to propose licensing the Red Velvet Collec-

tion images to plaintiff. Saal Dec. ¶ 6, Exh. 3. Pacific and Nova did not enter a license agreement at that time, i n part because the Monroe estate and the Tobacco Tax and Trade Bureau ("TTB") would likely not approve of nude photos of Monroe on wine labels. *Id.* In 2003, Pacific worked with the TTB and other consultants to develop a "modesty overlay" to cover Monroe's breasts and buttocks in the Red Velvet Collection photographs, and ultimately did acquire approval for a wine label from the TTB. *Id.* at ¶ 8, Exh. 5; *see also* second Richardson Dec. ¶¶ 1–4, Exh. 28.

In 2004 TKS and plaintiff entered a license agreement for use of Red Velvet Collection photos. Holder Dec. ¶¶ 7–8; Saal Dec. ¶ 9, Exh. 6. In May and June of 2005, relations between the parties began to deteriorate, and TKS notified plaintiff that it would "establish[ ] a new licensee for the remainder of the Red Velvet Collection Wine images for the successive years" covered in parties' 2004 agreement. Saal Dec. ¶ 11, Exh. 9. At that time, plaintiff received a license from Playboy Enterprises, Inc., for another photograph from the Red Velvet Collection series, which it used for its 2005 and 2006 Velvet Collection releases. Holder Dec. ¶ 8; *see also* Saal Dec. ¶ 10. In September 2005, TKS terminated its license agreement with plaintiff. Holder Dec. ¶ 10, Exh. 8. On September 21, 2005 plaintiff informed TKS's counsel that pursuant to a district court judgment against TKS, it would consider the Red Velvet Collection image licensed by TKS part of the public domain, and it would seek return of royalties paid by plaintiff to TKS for use of the image. Richardson Dec. ¶ 8, Exh. 27. Nova and TKS are currently in arbitration regarding the revocation of the license agreement.

After TKS terminated its agreement with plaintiff, it began negotiations with other wineries, including Sonoma Wine Company, to license the Red Velvet Collection images for use on wine labels. Saal Dec. ¶ 13. On February 23, 2006 plaintiff's counsel informed Sonoma Wine Company that it was "the exclusive licensee" of rights in Marilyn Monroe's image and likeness for wine, that Sonoma's release of wine with Marilyn Monroe's image on the label would constitute "infringement" and that plaintiff would take "all appropriate action" in response. *Id.* at ¶ 14, Exh. 10. Sonoma Wine Company thereafter withdrew from negotiations with TKS. *Id.*

In June or July 2006, plaintiff learned that defendant Adler Fels was marketing a wine bearing a photograph from the Velvet Collection. Redding Dec. ¶ 3; Lindsay Dec. ¶ 5. Plaintiff's broker, the American Beverage Group, informed Adler Fels that plaintiff was the exclusive licensee of the Monroe estate. Redding Dec. ¶ 3; Lindsay Dec. ¶ 5. On July 5, 2006 counsel for plaintiff Wines informed Adler Fels that "no one else" besides plaintiff had "the right to produce wines [bearing Marilyn Monroe's] likeness," and that plaintiff would "aggressively protect" its rights. Lindsay Dec. ¶ 6, Exh. 13. Counsel representing Adler Fels, TKS and Pacific Licensing responded on July 7, 2006 that his clients "decline to succumb to your threats." *Id.* ¶ 7, Exh. 14. Defendants subsequently informed plaintiff that they would not release a 1.5–liter bottle in the fall of 2006. *Id.* at ¶ 8. However, defendants' counsel also advised plaintiff that defendants might release a 750–milliliter bottle using Red Velvet Collection labels in Fall 2006. *Id.* at ¶ 8. This was the last communication between parties before plaintiff filed its complaint on September 29, 2006.

In late August 2006 Adler Fels began marketing 750–milliliter bottles of its "Red Velvet Collection ... ultra-fine wines."

*Id.* at ¶ 10–11; *see also* Holder Dec. ¶ 15, Exhs. J–K. Adler Fels invested more than one hundred work hours, and has spent $140,000 in development and production of its initial run of 2,500 cases of the Red Velvet Collection line. Lindsay Dec. ¶ 10. Pre-orders for Adler Fels' Red Velvet Collection line number 2,000 cases. *Id.* at ¶ 11. Defendants forecast that the Red Velvet Collection will sell 15,000 cases in its first year of release, and estimate revenues totaling four million dollars from these sales. *Id.* at ¶ 12. Adler Fels originally scheduled October 23, 2006 as its bottling date for the Red Velvet Collection wine, with a ship date of early November 2006. *Id.* at ¶ 14.

In September 2006 plaintiff received an announcement regarding Adler Fels' Red Velvet Collection wine, urging consumers to place orders by September 15. Holder Dec. ¶ 15, Exhs. J–K. The announcement attached a "mock-up" of the wine bottle for Adler's Red Velvet Collection line. *Id.* at Exh. K. The mock-up showed a photograph from TKS's Red Velvet Collection series on a bottle of red wine, though not a photo that plaintiff had used on any of its wines. *Id.*

Plaintiff filed its complaint for trademark infringement, trade dress infringement, unfair competition and passing off on September 29, 2006. Plaintiff served its complaint on defendants on October 5, 2006. That same day, plaintiff filed its ex parte application for a temporary restraining order and motion for preliminary injunction. This court granted a temporary restraining order on October 10, 2006, pending briefing and determination of plaintiff's request for preliminary injunction. On October 26, the court heard arguments regarding plaintiff's request for preliminary injunction.

## LEGAL STANDARD

■ "A preliminary injunction is a provisional remedy, the purpose of which is to preserve status quo and to prevent irreparable loss of rights prior to final disposition of the litigation." *Napa Valley Publ'g Co. v. City of Calistoga,* 225 F.Supp.2d 1176, 1180 (N.D.Cal.2002) (Chen, Mag. J.) (citing *Sierra On–Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1422 (9th Cir.1984)). In light of these considerations, a plaintiff seeking preliminary injunctive relief must demonstrate either: "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits [have been] raised and the balance of hardships tips sharply in [the plaintiff's] favor." *Southwest Voter Registration Educ. Project v. Shelley,* 344 F.3d 914, 917 (9th Cir.2003) (en banc) (per curiam) (citing *Clear Channel Outdoor, Inc. v. City of Los Angeles,* 340 F.3d 810, 813 (9th Cir.2003)); *see also Sun Microsystems, Inc. v. Microsoft Corp.,* 188 F.3d 1115, 1119 (9th Cir.1999). The components of these two tests, together with the added consideration of the public interest, operate on a sliding scale or "continuum." *Southwest Voter Registration Educ. Project,* 344 F.3d at 918. Consequently, "the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." *Id.* (citation omitted); *see also Miller v. California Pac. Med. Ctr.,* 19 F.3d 449, 456 (9th Cir. 1994) (en banc) (citations omitted).

■ As in any other civil proceeding, the likelihood of success on the merits and the balance of hardships are the critical considerations in determining whether a preliminary injunction should issue in a trademark infringement action. *See, e.g., Dr. Seuss Enters., L.P. v. Penguin Books*

USA, Inc., 109 F.3d 1394, 1406 (9th Cir. 1997). To prevail on the merits of a trademark infringement claim, a plaintiff must establish "that the defendant's use of its mark gives rise to a 'likelihood of confusion' in the consuming public." *Metro Publ'g, Ltd. v. San Jose Mercury News*, 987 F.2d 637, 640 (9th Cir.1993) (quoting *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir.1992)). "Once the plaintiff has demonstrated a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted." *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1066 (9th Cir.1999) (quoting *Metro Publ'g*, 987 F.2d at 640). Such an injunction may issue even if the plaintiff's mark has not been registered with the PTO. *Metro Publ'g*, 987 F.2d at 640 (citing *New West Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194, 1198 (9th Cir.1979)) ("It is not necessary that a trademark be registered in order for it to qualify for protection under the Lanham Act.").

## DISCUSSION

Plaintiff seeks protection for the following trademarks or trade dresses for use on wine: the registered trademark "Marilyn Monroe," the common law trademark "Marilyn," the common law trademarks consisting of the images and likenesses of Marilyn Monroe,[1] the common law trademark "Velvet Collection," and the trade dress comprised of "high quality, distinctive photographs of Marilyn Monroe in various poses taken at different times during her career that show her, [sic] beauty, glamour and sex appeal" ("the Marilyn Wines trade dress"). With the exception of "Velvet Collection" and the Marilyn Wines trade dress, plaintiff asserts that these marks are each owned by the Marilyn Monroe estate, which has granted plaintiff an exclusive license to use the marks in connection with wine. Significantly, plaintiff seeks protection for these marks and dresses *only* as they are used on wine bottles.

## I. Likelihood of Success on the Merits

### A. The "Marilyn Monroe" and "Marilyn" Marks

█ As a preliminary matter, defendants assert that plaintiff has no standing to bring infringement claims based on trademarks owned by the Marilyn Monroe estate, as such claims can only be brought by the owner or assignee of the marks. Defendants' argument in this regard is limited to claims under Section 32 of the Lanham Act (15 U.S.C. section 1114).[2] The issue is whether plaintiff's status as a licensee of the federally registered trademark "Marilyn Monroe" belonging to the Marilyn Monroe estate confers standing

---

1. Defendants have cited authority indicating that the image or likeness of a famous individual, standing alone, cannot be protected as a trademark. Plaintiff does not appear to contest that such "in gross" protection is not available, but rather argues that it seeks protection for the use of Marilyn Monroe's image and likeness on wine bottles only. Accordingly, the protectable interest in Marilyn Monroe's image is better assessed in the context of trade dress, discussed *infra*.

2. Defendants do not argue that plaintiff lacks standing to bring claims under Section 43(a) of the Lanham Act (15 U.S.C. section 1125(a)) for common law trademarks, and it appears that plaintiff clearly has standing under this provision. *See, e.g., Halicki v. Carroll Shelby Int'l, Inc.*, No. CV 04–8813 SJO, 2005 U.S. Dist. LEXIS 28214, at *32 (C.D.Cal. Nov. 11, 2005) (holding that "the question of ownership is immaterial to standing," and that to maintain a Section 1125(a) claim a plaintiff "must show that it has a commercial interest in the allegedly misused mark that is likely to be damaged").

upon plaintiff to bring the infringement claim. Defendants assert that only an assignment can confer such standing. Courts have held that an exclusive license that amounts to a *de facto* assignment creates standing in the exclusive licensee. *See National Licensing Ass'n, LLC v. Inland Joseph Fruit Co.*, 361 F.Supp.2d 1244, 1254 (E.D.Wash.2004). Where the licensor reserves all property rights in the mark, however, the licensee has no standing under Section 1114(1). *Id.See also Ultrapure Systems, Inc. v. Ham–Let Group*, 921 F.Supp. 659, 665 (N.D.Cal. 1996) (Williams, J.) (holding that a licensee lacks standing where the license is nonexclusive or "provisions in the contract indicate that the licensor retains exclusive ownership of the mark"). The license agreement between the Marilyn Monroe estate and plaintiff provides an exclusive license only with respect to the use of the mark on still wines, provides nonexclusive licenses with respect to other wines, and reserves to the estate all rights not explicitly granted. Holder Dec., Exh. A. Accordingly, the license is non-exclusive and does not convey a property interest. Plaintiff therefore lacks standing to assert claims for infringement of the registered "Marilyn Monroe" trademark.[3]

Plaintiff also asserts claims based on the common law trademark "Marilyn." The common first name "Marilyn," standing alone, is likely not a protectable trademark. *Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 760 (9th Cir.2006) ("Personal names—both surnames and first names—are generally regarded as descriptive terms, which are not inherently distinctive.") (internal quotations and citations omitted). Presumably, therefore, plaintiff is asserting an interest in the name "Marilyn" as it is represented within the registered trademark comprised of the stylized "Marilyn Monroe" signature. *See* Howard Dec., Exh. A. At first glance it would appear that any rights in the stylized "Marilyn" would be derivative of the rights in the registered "Marilyn Monroe" trademark, and plaintiff would therefore lack standing to assert the "Marilyn" mark as well. In any case, defendants represent that they have not and do not intend to use the stylized "Marilyn" mark. Because plaintiff can likely assert no interest in the word "Marilyn," and defendants do not intend to use the stylized version of the word, the protectability of the stylized "Marilyn" is moot.

### B. The "Velvet Collection" Mark

Plaintiff claims a common law trademark interest in the term "Velvet Collection" as it applies to wine. Plaintiff asserts that it has been using this term on its Marilyn Monroe wines since 2004. Defendants assert that this term is derived from the mark "Red Velvet Collection," owned by TKS, and that plaintiff's right to use the term is based solely on the licensing agreement that TKS and plaintiff entered into in May 2004. This licensing agreement is currently the subject of an arbitration pending elsewhere, and the court is hesitant to reach any conclusions that may influence, conflict with, or otherwise interfere with those proceedings. For the purposes of this preliminary injunction motion, the court therefore declines to reach the issue of whether plaintiff has a valid interest in the "Velvet Collection" mark.

In sum, plaintiff lacks standing to bring claims based on the "Marilyn Monroe" trademark. Regarding the "Marilyn"

---

**3.** Because plaintiff lacks standing to bring claims based on the "Marilyn Monroe" trademark, the court does not reach defendants' argument that their use of the "Marilyn Monroe" trademark constitutes fair use.

trademark, plaintiff either lacks standing or the issue is moot based on defendants' representation that it does not and will not use the mark. Because the court cannot determine the validity of plaintiff's claim regarding the "Velvet Collection" mark, plaintiff is not entitled to protection of that mark for the purposes of this preliminary injunction. Plaintiff has therefore identified no trademarks for which it is entitled to a preliminary injunction.

## C. *The Marilyn Wines Trade Dress*

■ Trade dress involves "the total image of a product and may include features such as size, shape, color or color combination, texture, graphics, or even particular sales techniques." *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 808 n. 13 (9th Cir.2003) (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 n. 1, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)). To state a claim for trade dress infringement, plaintiff must allege: (1) that its claimed trade dress is inherently distinctive or has acquired secondary meaning; (2) that its claimed trade dress is nonfunctional; and (3) that defendant's product creates a likelihood of consumer confusion. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1258 (9th Cir.2001).

### 1. *Distinctiveness*

■ In assessing distinctiveness, courts employ a five-part continuum of increasing inherent distinctiveness. A trademark or trade dress may be (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976); *see also GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir.2000). Marks and dresses falling into the latter three categories are entitled to protection without a showing of second-

ary meaning. *Two Pesos*, 505 U.S. at 768, 112 S.Ct. 2753. Plaintiff asserts that its trade dress—placing images of Marilyn Monroe on wine bottles—is arbitrary because there is no natural connection between Marilyn Monroe and wine.

While not explicitly tied to plaintiff's distinctiveness argument, defendants' arguments regarding the characterization of plaintiff's purported trade dress as merely an "idea or concept" are best addressed in this context. Defendants assert that placing images of Marilyn Monroe on wine bottles cannot be protected because it is "merely an idea or concept of putting photographs of Marilyn Monroe on a wine label." Defendants point to the common practice of attaching images of Marilyn Monroe to a wide variety of products as evidence that such a practice cannot be protected as trade dress.

Defendants' argument in this regard is unconvincing. The case upon which defendants rely, *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27 (2d Cir. 1995), is distinguishable. The idea in that case was die-cut photographic greeting cards. *Jeffrey Milstein*, 58 F.3d at 33. Specifically, the asserted trade dress consisted "solely of common and functional elements such as die-cutting, photographs, and blank white interiors." *Id.* at 30. The court therefore found that the asserted trade dress was a "generalized idea—one that has been applied, and has many applications, to products outside the greeting card context." *Id.* at 34. The court cited other die-cut products as evidence that the plaintiff's trade dress was not subject to protection. *Id.* The trade dress at issue in *Jeffrey Milstein* pertained only to the shape and design of the product itself rather than any ancillary information that would indicate source. Granting trade dress protection to the greeting card manufacturer would have improperly granted

the manufacturer a monopoly on a particular *type* of greeting card. Here, the product at issue is wine, not photographs of Marilyn Monroe. The images of Marilyn Monroe are placed on the labels of wine bottles, a context traditionally devoted to indicating the source of the wine inside the bottle. This case is therefore similar to *Philip Morris Inc. v. Star Tobacco Corp.*, where the court held that trade dress consisting of the geography of the American West and individual cowboys was inherently distinctive when used in advertising for cigarettes. 879 F.Supp. 379, 383 (S.D.N.Y. 1995). Likewise, the fact that images of Marilyn Monroe have appeared on other products such as apparel and collectible items does not render plaintiff's use of the mark generic, as these uses do not serve the unique source-identifying functions of wine labels.

A related argument raised by defendants is the assertion that the mere image or likeness of a famous individual is not subject to protection. Because plaintiff does not have a trademark in any specific image of Marilyn Monroe, Adler Fels' use of the TKS image on its wine bottle will infringe plaintiff's trade dress only if this trade dress can be construed to consist of the use of *any* image of Marilyn Monroe on wine.

Other courts have addressed the use of a famous likeness in trademark and trade dress. In *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 581 (2d Cir.1990), the daughters of Babe Ruth objected to the use of photographs of the baseball player in a calendar published by the defendant. The plaintiffs did not have any ownership interest in the specific photographs included in the calendar, but asserted that the calendar infringed their trademark rights in the image and name of Babe Ruth. *Id.* at 582. The court held that "a photograph of a human being, unlike a portrait of a fanciful cartoon character, is not inherently 'distinctive' in the trademark sense of tending to indicate origin." *Id.* at 583. The court went on to hold that "[t]he purpose of a trademark is to designate the source of a product and it has no existence apart from the trade in connection with which the mark is employed." *Id.* (internal quotations omitted). Regarding the plaintiffs' claim that they were entitled to protection regarding any use of the Babe Ruth image, the court held that "[i]t cannot be said that every photograph of Ruth serves this origin-indicating function," and therefore there was no basis for liability. *Id.*

Similarly, in *Estate of Presley v. Russen*, 513 F.Supp. 1339, 1344 (D.N.J.1981), the estate of Elvis Presley sought to enjoin the defendant from using "the image or likeness or persona of Elvis Presley or any equivalent ... on any goods, in any promotional materials, in any advertising or in connection with the offering or rendering of any musical services." The court held that the estate's claim to all images of Elvis Presley was too broad, but held that "a picture or illustration of Elvis Presley dressed in one of his characteristic jumpsuits and holding a microphone in a singing pose is likely to be found to function as a service mark." *Id.* at 1363–64. The court acknowledged that different forms of the so-called "Elvis Pose"—variations, for example, in the color of the jumpsuit or the orientation of the face—could all be considered a single "Elvis Pose" service mark. *Id.* at 1364. On this point, the court held that "a change which does not alter [a mark's] distinctive characteristics represents a continuity of trademark rights. Thus, where the distinctive character of the mark is not changed, the mark is, in effect, the same and the rights obtained by virtue of the earlier use of the prior form inure to the later form." *Id.* (quoting *Ilco Corp. v. Ideal Security Hard-*

*ware Corp.*, 527 F.2d 1221, 1224 (Cust. & Pat.App.1976)).

Finally, in *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 918 (6th Cir.2003), ETW, the licensing agent of Tiger Woods asserted that the inclusion of several original images of Woods on a painting by the defendant infringed ETW's trademark in the likeness of Tiger Woods. The court held that

> [i]mages and likenesses of Woods are not protectable as a trademark because they do not perform the trademark function of designation. They do not distinguish and identify the source of goods. They cannot function as a trademark because there are undoubtedly thousands of images and likenesses of Woods taken by countless photographers, and drawn, sketched, or painted by numerous artists, which have been published in many forms of media, and sold and distributed throughout the world. No reasonable person could believe that merely because these photographs or paintings contain Woods's likeness or image, they all originated with Woods.

*Id.* at 922. The court further announced the "general rule" that "a person's image or likeness cannot function as a trademark." *Id.*

Each of these cases is legally and factually distinguishable from the circumstances here. In each case, the plaintiff was attempting to establish an individual's likeness or image as a trademark, essentially attempting to secure control over all use of the person's likeness whatsoever. The nature of the mark to be protected and use to be enjoined were both very broad—the plaintiffs sought protection for all likenesses of a particular person, and sought to enjoin the use of those likenesses in all circumstances. The context in which plaintiff has used the Marilyn Monroe image, combined with the fact that plaintiff's

asserted rights derive from trade dress rather than trademark, manifestly distinguishes plaintiff's case from these trademark cases. While trademarks are rights in gross regarding a particular image, trade dress protects only the general appearance of a particular product or service. Put another way, the use at issue in this case is not simply the use of the Marilyn Monroe image, it is the use of the Marilyn Monroe image *on wine bottles.* Plaintiff's unique, long-standing practice of placing various images of Marilyn Monroe on its wines has created a recognizable trade dress specifically limited to the sale of wine. Accordingly, the fact that the trade dress includes a component that is not independently protectable as a trademark does not defeat the validity of the trade dress. *See Jeffrey Milstein,* 58 F.3d at 32 ("Although each element of a trade dress individually might not be inherently distinctive, it is the combination of elements that should be the focus of the distinctiveness inquiry."). It is not merely the Marilyn Monroe image itself, but the consistent and repeated use of the Marilyn Monroe image on a specific product in a specific manner, that constitutes the trade dress.

Because the use of Marilyn Monroe images on wine labels is a valid trade dress and there is no natural connection between Marilyn Monroe and wine, the Marilyn Wines trade dress is inherently distinctive.

### 2. *Functionality*

 Defendants claim that the Marilyn Monroe trade dress is aesthetically functional. Because defendants misstate the applicable standard in the Ninth Circuit, this argument warrants little discussion. The Ninth Circuit recently discussed aesthetic functionality at length in *Au–Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062 (9th Cir. 2006). The test for aesthetic functionality

is "whether protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage." *Id.* at 1072. Defendants' suggestion that the core inquiry in aesthetic functionality is whether "the trade dress is an important ingredient in the commercial success of the product" is therefore incorrect. In *Au–Tomotive Gold,* the Ninth Circuit "squarely rejected the notion that 'any feature of a product which contributes to the consumer appeal and saleability of the product is, as a matter of law, a functional element of that product.'" *Id.* at 1073 (quoting *Vuitton Et Fils S.A. v. J. Young Enters., Inc.,* 644 F.2d 769, 773 (9th Cir.1981)). Defendants do not assert that they would be placed at a significant competitive disadvantage if they were denied the right to place Marilyn Monroe images on their wine bottles. The court therefore finds that the Marilyn Monroe trade dress is non-functional.

### 3. *Secondary Meaning*

Although secondary meaning is not required to protect an inherently distinctive trade dress, a brief discussion of secondary meaning is appropriate given the factors the court must consider in a preliminary injunction inquiry. Trade dress acquires secondary meaning "when the purchasing public associates the dress with a particular source." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 843 (9th Cir.1987).

Plaintiff asserts that its use of the Marilyn Monroe trade dress has acquired secondary meaning because plaintiff has been using Marilyn Monroe images on its wine bottles for nearly twenty years, and invested substantial amounts in marketing based on the Marilyn Monroe branding. While plaintiff does not submit any consumer data to show actual consumer association between Marilyn Monroe wine labels and Nova wines, the fact that plaintiff has been using Marilyn Monroe prominently on its labels and promotional materials for a substantial period of time—and, indeed, appears to be the only winery to make such use of the Marilyn Monroe image during this time—suggests a strong connection between Marilyn Monroe wine labels and Nova wines.

In response, defendants assert that the photographs of Marilyn Monroe are "part of the product itself" rather than a source identifier, relying on *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Productions,* 134 F.3d 749 (6th Cir.1998). In *Rock & Roll Hall of Fame,* the defendant was selling posters featuring a photograph of the Rock & Roll Hall of Fame and Museum building, and the plaintiff asserted a trademark interest in the building design. *Id.* at 751. In concluding that the building was "the good itself" and therefore not subject to protection, the Sixth Circuit drew a key distinction that renders the *Rock & Roll Hall of Fame* case inapplicable to this action:

> [W]hen we view the photograph in Gentile's poster, we do not readily recognize the design of the Museum's building as an indicator of source or sponsorship. What we see, rather, is a photograph of an accessible, well-known, public landmark. Stated somewhat differently, in Gentile's poster, the Museum's building strikes us not as a separate and distinct mark *on the good,* but, rather, as the good itself.

*Id.* at 754 (emphasis in original). Here, Marilyn Monroe is not the good itself. The good is the wine inside the bottle, and the Marilyn Monroe image is a mark on the good indicating its source.

Accordingly, the court finds that plaintiff is likely to prevail on the issue of

secondary meaning.[4]

## D. *Likelihood of Confusion*

■ To determine whether plaintiff is entitled to injunctive relief regarding its trade dress claim, the central inquiry is whether Adler Fels' use of the asserted dress is likely to cause consumer confusion. *See Brookfield Commc'ns,* 174 F.3d at 1053 (quoting *Official Airline Guides, Inc. v. Goss,* 6 F.3d 1385, 1391 (9th Cir. 1993)) (characterizing the likelihood of confusion inquiry as "[t]he core element of trademark infringement"). A likelihood of confusion exists "when consumers are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques." *Nutri/System, Inc. v. Con–Stan Indus., Inc.,* 809 F.2d 601, 604 (9th Cir.1987) (quoting *Shakey's Inc. v. Covalt,* 704 F.2d 426, 431 (9th Cir.1983)). In *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir.1979), the Ninth Circuit listed eight factors to be considered as part of the consumer confusion inquiry. *Id.* at 348–49. These "*Sleekcraft* factors" are: (1) the similarity of the marks; (2) the strength of the plaintiff's mark; (3) the relatedness or proximity of the goods; (4) the marketing channels used by each party; (5) the degree of care likely to be exercised by the purchaser; (6) the defendant's intent in selecting the mark; (7) evidence of actual confusion; and (8) the likelihood of expansion of the parties' product lines. *Id.; see also Brookfield Commc'ns,* 174 F.3d at 1053–54. "Likelihood of confusion in the trade dress context is evaluated by reference to the same factors used in the ordinary trademark context." *Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609, 616 (9th Cir.1989). Because plaintiff has only shown a valid interest in its Marilyn Wines trade dress, the court will apply these factors to the asserted trade dress.

### 1. *Similarity of the Marks*

■ The first *Sleekcraft* factor, the similarity of the parties' marks, is "the most crucial factor in determining the likelihood of confusion." *Newsguy, Inc. v. Yomtobian,* No. C 04–0811 CRB, 2004 WL 2944051, at *4 (N.D.Cal. Dec. 20, 2004) (Breyer, J.) (quoting *Golden West Fin. v. WMA Mortgage Servs., Inc.,* No. C 02–5727 CRB, 2003 WL 1343019, at *4 (N.D.Cal. Mar. 13, 2003) (Breyer, J.)); *see also GoTo.com,* 202 F.3d at 1205 (9th Cir. 2000) (noting that "the similarity of the marks [ ] has always been considered a critical question in the likelihood-of-confusion analysis"). In comparing the parties' marks, the court must focus on how each of the marks is perceived by the ordinary consumer in the marketplace. *See Brookfield Commc'ns,* 174 F.3d at 1054; *Dreamwerks Prod. Group, Inc. v. SKG Studio,* 142 F.3d 1127, 1131 (9th Cir.1998). The "greater the similarity between the two marks at issue, the greater the likelihood of confusion." *GoTo.com,* 202 F.3d at 1206.

■ Here, Adler Fels' Red Velvet Collection bottle is virtually identical to plaintiff's 2002 and 2004 Velvet Collection bottles.[5] Holder Dec., Exhs. E & K. The

---

4. Defendants also point out that neither plaintiff nor the Marilyn Monroe estate ever identified the images of Marilyn Monroe as trademarks by designating them with the "TM" indicator. This argument is without merit regarding the trade dress claim, however, as the specific images of Marilyn Monroe need not be trademarked in order to give rise to trade dress protection.

5. According to the exhibits submitted with the Holder Declaration, plaintiff used the same photo of Marilyn Monroe on its 2002 and 2004 releases.

image portion of each label contains only a photograph from the TKS Red Velvet Collection with no text, with "modesty overlays" covering portions of Marilyn Monroe's body. The poses selected for each label are also strikingly similar. The noticeable differences are: (1) Monroe's overall orientation is right-facing on the Nova bottles, and left-facing on the Adler Fels bottle, though in both images she is turned toward the viewer; (2) Monroe has both hands behind her head in the Adler Fels photo, but only one hand behind her head in the Nova photo, though the position and orientation of the arm closest to the viewer is nearly identical in both photos; (3) on the Nova bottle, Monroe's head is tipped back slightly and her face is somewhat more emotionally expressive; and (4) the "modesty overlay" on the Adler Fels bottle is less modest than the overlay on the Nova bottles, leaving more of Monroe's breasts visible. In all other material respects the orientation and position of Monroe's body is the same. This similarity between Adler Fels' product and existing products bearing plaintiff's trade dress brings this factor squarely in favor of plaintiff.

### 2. Strength of Plaintiff's Mark

The second *Sleekcraft* factor is the strength of plaintiff's Marilyn Wines trade dress. The strength of protection afforded to a trade dress is proportionate to the likelihood that the public will remember the mark and associate it with the source of the trademarked goods. *GoTo. com,* 202 F.3d at 1207 (citing *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.,* 963 F.2d 350, 353 (Fed.Cir.1992)). Both the "conceptual" and "commercial" strength of the dress must be considered in this analysis. *Id.* The first of these considerations, the dress' "conceptual strength," involves the familiar classification of trade dress along a spectrum of increasing distinctive-

ness, in which marks are categorized as generic, descriptive, suggestive, and arbitrary or fanciful. *Id.; see also Brookfield Commc'ns,* 174 F.3d at 1058. As discussed *supra,* there is no natural connection between Marilyn Monroe and wine. The selection of Marilyn Monroe images for plaintiff's wine labels therefore creates a strong trade dress. This factor, too, weighs in favor of plaintiff.

### 3. Relatedness or Proximity of the Goods

The third *Sleekcraft* factor to be considered is the relatedness or proximity of the parties' goods. This factor reflects the common-sense intuition that the danger of consumer confusion is heightened where goods are related or complimentary. *See E. & J. Gallo,* 967 F.2d at 1291 (citing *AMF,* 599 F.2d at 350). Here, both plaintiff and defendant sell wines. The court therefore finds that the close proximity of the parties' products increases the likelihood of consumer confusion.

### 4. Marketing Channels Used

The fourth *Sleekcraft* factor requires the court to examine the marketing channels that each of the parties uses to sell and advertise its goods or services. "Convergent marketing channels increase the likelihood of confusion." *Official Airline Guides,* 6 F.3d at 1393 (quoting *Nutri/System,* 809 F.2d at 606). Similarity of the parties' advertising methods is also considered as part of this inquiry. *Nutri/System,* 809 F.2d at 606 (citing *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1535 (4th Cir.1984)).

The consideration of this factor is necessarily conjectural, as Adler Fels has not begun selling its Red Velvet Collection wine. The court therefore affords this

factor little weight, and does not reach the issue of which party this factor favors.

### 5. *Degree of Care Likely to Be Exercised by the Purchaser*

 The next factor to be considered is the degree of care that a consumer is likely to exercise in purchasing the parties' products. The court views the parties' products from the standpoint of "typical buyer exercising ordinary caution." *Sleekcraft,* 599 F.2d at 353 (citing *HMH Pub. Co. v. Lambert,* 482 F.2d 595, 599 n. 6 (9th Cir.1973)). It is thus assumed that sophisticated consumers and buyers of expensive goods will exercise greater care in their purchases, thereby reducing the likelihood of confusion or mistake as to the origin of the goods. *See, e.g., Entrepreneur Media, Inc. v. Smith,* 279 F.3d 1135, 1152 (9th Cir.2002). Conversely, "[c]onfusion between marks is generally more likely where the goods at issue involve relatively inexpensive, 'impulse' products to which the average, 'unsophisticated' consumer does not devote a great deal of care and consideration in purchasing." *E. & J. Gallo Winery v. Consorzio del Gallo Nero,* 782 F.Supp. 457, 464–65 (N.D.Cal.1991) (Jensen, J.) (citing *Grey v. Campbell Soup Co.,* 650 F.Supp. 1166, 1175 (C.D.Cal. 1986)). As the court observed in *Gallo Nero,* there is little doubt that wine purchasers typically fall into the latter category of unsophisticated, "impulse" buyers. *Id.* at 465; *see also Taylor Wine Co. v. Bully Hill Vineyards, Inc.,* 569 F.2d 731, 734 (2d Cir.1978) (observing that "the average American who drinks wine on occasion can hardly pass for a connoisseur of wines" and thus "remains an easy mark for an infringer").

 Plaintiff asserts that even careful consumers are likely to view Adler Fels' Red Velvet Collection as associated with, or a brand extension of, plaintiff's existing line of products. Defendants claim that there is no likelihood of confusion because the Marilyn Monroe images appear on the "back" labels of the respective wine bottles, while the "front" labels contain source-identifying information required by federal law. Defendants cite 27 C.F.R. section 4.35 in support of this position. According to defendants, the specificity of the information required by the C.F.R. makes confusion "virtually impossible."

This argument is nothing short of absurd. To begin with, although the C.F.R. lists several requirements regarding the information to be included on wine packaging, the words "front" and "back" appear nowhere in the section cited by defendants. Rather, the section provides that the required information appear on "*A* label on each container of American wine." 27 C.F.R. § 4.35(a) (emphasis added). More importantly, the suggestion that Nova or Adler Fels would go through the trouble of licensing and placing a visually compelling image on their wine bottles just so they could appear on the "back" of the bottle is outrageous. Consumers purchasing Marilyn Monroe wines are drawn to the image of Marilyn Monroe, not the detailed textual source information on the opposite side of the bottle. Adler Fels' own promotional announcement regarding its Red Velvet Collection wine contained a photograph not of the purported "front" of its wine bottle, but of the portion of the label consisting entirely of the Marilyn Monroe image. Holder Dec. ¶ 15, Exhs. J–K. As a general matter, furthermore, no wine retailer that this court is aware of, no matter how large or small, shelves its wine bottles with the artwork facing the wall. This is precisely because consumers, in selecting wine, are much more concerned with the distinctive design of the wine label than with the textual information regarding geographic origin, the dangers of

alcohol to pregnant women, the presence of sulfides, or any of the other legally required verbiage that appears on the less interesting side of the wine bottle. Indeed, if 27 C.F.R. section 4.35 were a silver bullet against consumer confusion, there could never be a case of trademark or trade dress infringement in the wine industry.

Accordingly, the court finds that plaintiff is likely to show that the ordinary degree of care exercised by typical wine purchasers will not lead these purchasers to verify the source of the wine by reading the reverse side of the Marilyn Monroe label. This factor therefore favors plaintiff.

### 6. *Defendant's Intent in Selecting the Mark*

The next *Sleekcraft* factor directs the court to consider defendant's intent in selecting the Marilyn Wines trade dress. Because courts assume that a defendant who intentionally attempts to confuse consumers will in fact succeed in doing so, evidence of such an intent is probative of likelihood of confusion. *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir.2004) (citing *Sleekcraft*, 599 F.2d at 348 n. 9). On the other hand, while good faith "may be given considerable weight in fashioning a remedy," it is only marginally probative of absence of consumer confusion. *Sleekcraft*, 599 F.2d at 354; *see also Golden Door, Inc. v. Odisho*, 646 F.2d 347, 351 (9th Cir.1980).

The communications between the parties in summer 2006 are instructive in this regard. When plaintiff first learned that Adler Fels was marketing a wine bearing a photograph from the Red Velvet Collection, plaintiff's broker contacted Adler Fels and informed them that plaintiff was the exclusive licensee of the Monroe estate. Reading Dec. ¶ 3; Lindsay

Dec. ¶ 5. Shortly thereafter, counsel for Nova Wines informed Adler that "no one else" besides plaintiff had "the right to produce wines [bearing Marilyn Monroe's] likeness," and that plaintiff would "aggressively protect" its rights. Lindsay Dec. ¶ 6, Exh. 13. Counsel representing Adler, TKS and Pacific responded the following day, expressing skepticism that plaintiff had exclusive rights to use Marilyn Monroe's name and likeness for all wines, and stating that Adler Fels would not "succumb to [Nova's] threats." *Id.* ¶ 7, Exh. 14. A review of this correspondence reveals that the discussion centered around the contractual rights of each party to use the Marilyn Monroe images, rather than any specific mention of trademark, trade dress, or consumer confusion. Plaintiffs make no showing that defendants' intention in using the images was to capitalize on plaintiff's established trade dress or otherwise create consumer confusion. This factor therefore favors defendants.

### 7. *Evidence of Actual Confusion and Likelihood of Expansion*

Plaintiff claims that the final two factors—evidence of actual confusion and likelihood of expansion into competing product lines—bear little weight in this case, and the court agrees. Because Adler Fels has not yet begun to sell its Red Velvet Collection wines, actual consumer confusion is necessarily limited, if it exists at all. Furthermore, the expansion factor is irrelevant because Nova and Adler Fels are already direct competitors.

### 8. *Weighing the Sleekcraft Factors*

In summary, the court finds the following *Sleekcraft* factors weigh in favor of plaintiff: the similarity of the trade dresses, the strength of the Marilyn Wines trade dress, the relatedness of the parties' goods, and the degree of care likely to be

exercised by purchasers of the parties' products. Although the intent in choosing the trade dress weighs in favor of defendant, lack of intent is of little probative value in assessing likelihood of confusion. The remaining factors are of little importance under the circumstances and do not favor either party. Because all of the probative factors, including the all-important similarity factor, weigh in favor of plaintiff, the court finds that plaintiff has established by a preponderance of the evidence that it will able to prove a likelihood of consumer confusion at trial.

This does not end the inquiry as to likelihood of success on the merits, however, as defendants have raised a number of specific defenses that remain to be considered. Essentially, defendants claim on several grounds that they have a superior right to use the Red Velvet Collection images on wine labels, and this right cannot be defeated by trade dress protection.

### E. *TKS's Claims to Superior Rights in the Marilyn Monroe Image*

Defendants assert that TKS owns copyrights in the Red Velvet Collection images, and plaintiff's trade dress interests cannot prevent TKS from licensing its copyrighted works to Adler Fels for the use on wine labels. This case therefore presents a conflict between two asserted intellectual property rights: Nova's trade dress and TKS's copyright. The issue is whether plaintiff's trade dress rights can prevent TKS from exploiting its copyright by licensing images for use on wine labels. While the parties cite to no cases addressing this specific intersection between copyright and trade dress, the Federal Circuit has found that service mark registration does not give the owner of the mark the right to infringe another's copyright. *Boyle v. United States,* 200 F.3d 1369, 1373 (Fed.Cir.2000). In *Boyle,* a copyright owner challenged the government's failure to cancel a competitor's service mark registration which, according to the copyright owner, effectively destroyed his copyright. *Id.* at 1372. Although the court declined to reach the issue on sovereign immunity grounds, the court noted that while a "grant of a service mark registration entitles the registrant to certain rights and privileges under the Trademark Act [citations], the right to infringe another's copyright is not one of those rights." *Id.* at 1373. The court therefore held that, as a matter of law, "the government's issuance of a service mark registration ... cannot be construed as either authorization or consent for it to infringe Boyle's copyright," and that "possession of a service mark is not a defense to infringement of a valid copyright." *Id.* at 1373–74. A complementary conclusion is that a valid copyright does not entitle the copyright holder to infringe another's trade dress rights. This is particularly true where, as here, the plaintiff's trade dress rights are considerably broader than the defendants' copyright interests at issue. Nova has developed a unique trade dress, over a substantial period of time, comprising the use of Marilyn Monroe's name and image on wine labels. The trade dress interest therefore covers all images of Marilyn Monroe used on wine labels. These rights are broader than TKS's copyright interests in the specific images comprising its Red Velvet Collection. Plaintiff's trade dress rights therefore entitle it to prevent TKS from exercising the narrow portion of its copyright interests consisting of licensing images of Marilyn Monroe for use on wine bottles.

Similarly, defendants claim that their intended use of the Red Velvet Collection images is authorized by a model release signed by Marilyn Monroe before her death. Plaintiff states that it contests

the validity of this model release "for a number of reasons," none of which are delineated. Wegner Dec. ¶ 6. It is not clear whether this model release is being contested in any other proceedings involving these parties. In any case, any rights granted to TKS by the model release would be no stronger than its copyright interests in the Red Velvet Collection photographs. Because TKS's copyright cannot defeat plaintiff's trade dress, the model release is similarly unavailing.

In addition to these specific rights, defendants assert that the Marilyn Monroe estate itself has no valid rights of publicity to assign to plaintiff, and any rights of publicity that may exist are preempted by TKS's copyrights. Marilyn Monroe's purported rights of publicity are currently the subject of ongoing litigation in several states, including, according to defendants, Marilyn Monroe's probate proceeding which has been open since her death in 1962. Given the fact that the instant action involves trademarks and trade dress, rather than the right of publicity, the court is not persuaded of the relevance of defendants' argument. The court therefore declines to wade into the murky waters surrounding the estate's purported rights of publicity.

■ Finally, defendants assert that, under the terms of the licensing agreement between TKS and plaintiff, plaintiff was prohibited from acquiring any rights in the Red Velvet Collection images based on its use of the images on its wine labels. Again, the court is hesitant to interpret the licensing agreement while the separate arbitration between TKS in Nova is pending. Nonetheless, the court finds that this argument is without merit. Plaintiff's trade dress interest does not arise from its license or use of the Red Velvet Collection images. Rather, the trade dress interest in placing Marilyn Monroe images on wine

labels was in place before plaintiff licensed the Red Velvet Collection images from TKS. While securing copyright licenses for various Marilyn Monroe images was necessary to develop the trade dress over time, by the time plaintiff secured its copyright license from TKS the trade dress was well-established. The specific May 2004 license was a means of adding another Marilyn Monroe wine to plaintiff's existing line of products. It did not create a new trade dress out of whole cloth that TKS was entitled to acquire under the licensing agreement.

Accordingly, defendants' claim to superior rights in the Red Velvet Collection photographs for use on wine labels is unconvincing. Because plaintiff has asserted a valid trade dress inference and shown a likelihood of confusion, the court finds that plaintiff has demonstrated a likelihood of success on the merits. "Once the plaintiff has demonstrated a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted." *Brookfield Commc'ns.*, 174 F.3d at 1066. Plaintiff is therefore entitled to injunctive relief.

## II. *Balance of Hardships*

■ While plaintiff's demonstration of likelihood of confusion is sufficient to warrant injunctive relief, the court further finds that injunctive relief is warranted under the Ninth Circuit's alternative test: serious questions going to the merits of the case combined with the balance of hardships tipping sharply in favor of the plaintiff. *Southwest Voter Registration Educ. Project*, 344 F.3d at 917. As the sole purveyor of Marilyn Monroe wines for the past twenty years, plaintiff may suffer immeasurable and irreparable damage to its reputation and goodwill if other wineries are able to sell wines with nearly iden-

tical packaging outside the control of plaintiff.

In contrast, defendants have made very little showing of hardship should an injunction issue. Defendants claim that they will suffer irreparable harm through loss of "market time," injury to reputation by being unable to follow through with its planned introduction of its Marilyn Monroe wines, and a negative perception in the marketplace as an infringer without proof that plaintiff has any rights or that defendants have violated those rights. Defendants assert that they will suffer financial losses in excess of $4 million should an injunction issue, based on their inability to fill orders and exploit "initial publicity and buzz" in time to make holiday season sales. Lindsay Dec. ¶¶ 13–14; Saal Dec. ¶ 21. Defendants offer no data to support this figure.

Defendants cite cases in which parties suffered harm by being forced to withdraw their products or were effectively shut down by the injunction. *Illinois Tool Works, Inc. v. Grip–Pak, Inc.*, 906 F.2d 679, 683 (Fed.Cir.1990); *Flotec, Inc. v. Southern Research, Inc.*, 16 F.Supp.2d 992, 1012 (S.D.Ind.1998). Defendants seem to ignore the crucial fact that Adler Fels' product has not yet been released into the market place. There are thus no products to withdraw, and it is unlikely that defendants will be "shut down" by being temporarily prevented from releasing a particular product. Notably, defendants have offered no explanation as to why they cannot simply use a different, clearly non-infringing label for the particular wine they have chosen as their Red Velvet Collection wine. As there can be no possible relationship between the image of Marilyn Monroe and the flavor of the wine, that which we call Marilyn Monroe wine, by any other name, would taste as sweet. *See* William Shakespeare, Romeo and Ju-

liet, act 2, sc. 2. In addition, Adler Fels has been in the business of selling wine under a wide variety of names and labels. Given the large number of unclaimed names and images that Adler Fels could select for its wines, it is difficult to see how Adler Fels' business will be adversely affected by being barred from using the name or image of one particular individual.

█ Finally, defendants claim that plaintiff's delay in filing its TRO application and motion for preliminary injunction militate against granting a preliminary injunction. The court does not find undue delay here. Although the initial controversy erupted in June or July 2006, plaintiff did not learn that Adler Fels was actually marketing its upcoming Red Velvet Collection wine until September, and the earlier communications between the parties did not indicate that Adler Fels would be selling such a wine. Plaintiff served its complaint, TRO application, and motion for a preliminary injunction, the following month. This time frame was reasonable and therefore does not bar injunctive relief.

Accordingly, the court finds that the balance of hardships tips sharply in plaintiff's favor.

## CONCLUSION

For the reasons stated above, the court GRANTS plaintiff's motion for a preliminary injunction.

IT IS SO ORDERED.